HAROLD FOOS ET AL., APPELLEES, V. JACOB REUTER, APPELLANT.

142 N. W. 2d 552

Filed May 13, 1966. No. 36103.

Robert M. Harris, for appellant.

W. H. Kerwin, for appellees.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, BROWER, SMITH, and McCOWN, JJ.

BROWER, J.

This action was brought by the plaintiffs and appellees Harold Foos and Ann Foos as joint owners of the west half of the southwest quarter of Section 25, Township 22 North, Range 53 West of the 6th P.M., in Scotts Bluff County, Nebraska, for a judgment establishing the east boundary to said property and to enjoin the defendant from removing the survey stakes placed thereon. The defendant and appellant Jacob Reuter is the owner of the east half of said quarter section. When the plaintiff is referred to either in the singular or as Foos, the reference is to Harold Foos.

The defendant filed an answer and cross-petition in which he admitted the plaintiffs were the owners of the land described in the petition except a certain tract described by metes and bounds in the answer and designated therein as Blackacre. It alleged the defendant was the owner of the east half of said quarter section in Section 25, together with Blackacre as to which it was alleged defendant had acquired title by adverse posses-

sion. The cross-petition asked to have his title to Black-acre quieted. The reply denies the defendant's owner-ship of Blackacre.

At the conclusion of the trial of the issues the district court found for the plaintiffs, and by its judgment estab-lished the line of the survey of the county surveyor as the boundary between the two tracts and dismissed the defendant's cross-petition.

The defendant alleges the trial court erred in finding the true boundary between the land of the plaintiff and defendant was that surveyed by the county surveyor, in finding the plaintiff was the owner of Blackacre, and in not quieting the title thereto in defendant by reason of his claimed adverse possession. This requires a care-ful review of the evidence.

Blackacre consists of 2.2 acres of land lying along the length of the west side of the surveyed division line between the lands of the parties. It is irregular in shape. In 1963 the parties quarreled over the boundary line. Plaintiff employed the county surveyor, who surveyed and platted the line. Defendant was not satisfied with the line so determined and had another survey run which resulted in confirmation of that made by the county surveyor. Nails with red cloth attached were driven down this line and lath placed between them at intervals by the county surveyor. No attempt is made to question that the survey reestablished the original line between the two tracts. The defendant relies wholly on adverse possession to establish his claim of title to Blackacre.

Defendant purchased his farm, described in the deed as the east half of the southwest quarter of said section, in December 1922. The plaintiff bought his land by deed dated December 23, 1950, in which it is designated as the west half of said quarter section, from one Steele. He seems to have gone into possession in the spring of 1951. The adverse possession claimed by the defendant

originated when the plaintiffs' property belonged to Steele.

Steele testified he bought his land in 1945. That spring he had a survey made by one Cooper, the then county surveyor. A plat of that survey, defendant's exhibit 2, dated March 24, 1945, is in evidence. The survey was made primarily to establish Steele's north line with respect to a third party's private road located there. It did, however, incidentally purport to show the line between the two premises in controversy here. The evidence showed the line so surveyed did not correspond with the government survey. It indicated, however, the division line as then used on the north was 16 to 24 feet over on the Steele land. The next year Reuter, at Steele's suggestion, moved the fence back to the east 14 feet. When Steele purchased the land a drainage ditch came from the west into his premises and went south through it. In the spring of the second year of his ownership Steele, with the cooperation of the defendant, changed the course of the ditch by extending it eastward to the division fence. This was removed and the ditch dug south down the fence line to the south boundary of the premises where it was turned east. The water came down later in the season and the ditch washed down and "zigzagged quite a little bit." They attempted to correct this with horse-drawn implements. The next spring, however, they got a dragline which straightened it. Another drainage ditch, referred to as the "stub ditch" was then dug to the north a short distance on Steele's land. It connected with the former one, near the division line. From that time during his ownership Steele farmed from the west up to the drainage ditch on the south and to the fence north of it, and at that time defendant farmed the land to the east. Steele said the water originally had caused the ditch to erode and meander somewhat, but he thought that when straightened with the dragline it was on approximately the same line as the fence had been. The next spring after the

ditch was straightened up Reuter put a row of trees on the ditch bank. Steele had never returned to the land after he sold it in 1951.

The defendant's testimony was substantially the same as that of Steele with respect to the period in which those two were adjoining landowners. There is a considerable conflict in the evidence after the plaintiff purchased the west half of the quarter section from Steele.

Defendant's exhibit 4 is a plat made by defendant's surveyor, one Roberts, admitted in evidence without the maker's testimony. It shows Blackacre which adjoins the surveyed division line to the west through its entire length. Its western boundary is quite irregular.

The southern portion of Blackacre, extending about 1,165 feet north from the south property line of the parties, is where the original drainage ditch was dug. This portion of Blackacre is referred to in the evidence as part A. It is 9 feet in width at the road on the south measured from the survey line to the center of the ditch on the west. It becomes wider as it extends to the north and is 45 feet wide at the point 1,165 feet from the south road. The row of trees hitherto referred to as planted by the defendant after the ditch was dug is on the east bank of the drainage ditch. Strands of barbed wire were later nailed to the trees to form a fence. The defendant testified he farmed continuously up to this row of trees after digging the ditch in 1947. When it was in alfalfa hay he cut it close to the trees. When in row crops running east and west he used it for turning space and as a road. From time to time he was forced to cut off the lower branches of the trees so as to get up close. Plaintiff testified he pastured up to these trees from the west in 1955 and 1956. He repaired the fence along the trees while so pasturing. Its use was unsatisfactory because the erosion would wash underneath the fence and it would not hold his cattle. The defendant claims title to the center of the ditch, but there is no evidence of substance that he ever made use of any

ground to the west of the trees which were on the east bank. Defendant testified plaintiff did not cultivate or use the ground east of the trees. Plaintiff stated this narrow neck, 6½ feet wide to the south and only 27 feet in width at any point, could not be utilized with modern machinery. At the south end of part A was a wooden check which the plaintiff tore out and replaced with a new concrete one at his own expense in 1955. Defendant's exhibit 13 is a photograph showing the ditch area taken from the south of the check and looking north toward and beyond it. On both sides the area appears to be thick with dense underbrush much higher than the defendant's son standing on the concrete structure. The county surveyor testified they were unable to see through the brush in this area in surveying the line and were compelled to run an offset line and measure back from this to the division line which he established. The defendant admitted the plaintiff had pastured this portion of Blackacre in 1955 and added a line of barbed wire to the fence in the trees. At one point defendant states he gave plaintiff permission to so use it and at another says permission was not given.

To the north of part A hitherto discussed is part B, beginning in the vicinity of the concrete check and extending about 750 feet northward. This is a bog and unsuitable for cultivation. In this area is the so-called "stub ditch" dug by Steele. Defendant placed a fence on the east ditch bank to get on higher ground where the posts would hold. Defendant testified he pastured this area up to the fence. Plaintiff said there had been fences in this area from time to time but they were never in the same place and there never was an established line fence. The fence was never in a straight line, the posts were scattered about and staggered, and in places there were no posts at all. The plat, exhibit 4, shows two parallel fences in most of this area. Both parties claim to have pastured this disputed area. The

photograph, exhibit 13, seems to show the southern portion of the area immediately north of the concrete check and this appears wooded also.

The northern portion of Blackacre west of the surveyed line is referred to in the testimony as part C. This appears from the evidence to be level, irrigated farmland used for cultivated crops. From the plat, exhibit 4, the area is about 695 feet in length. Defendant testified he built through part C a permanent fence on the line established between Steele and himself in 1947 or 1948. It blew full of dirt and debris and was removed by him although the date of removal is not shown. Thereafter only temporary fences were used to keep the livestock in while crops were being pastured or roughed down. No fences existed or had for some time been on the line there when the controversy between the parties arose in 1963. Defendant testified he claimed the disputed area in part C of Blackacre and testified it was farmed with crops by him or his tenants ever since he moved the fence back at Steele's suggestion. He had not personally farmed it since the return of his son. The son, Leo Reuter, testified he went away in 1951 and returned in 1958. He testified to harvesting crops thereon from 1958 to 1962 inclusive. The plaintiff had a corn crop west of the surveyed line in 1962. It did not extend eastward to include the disputed area. There was, however, a space used by the plaintiff immediately east of the corn for a road to tend his crop. Further east of that was an alfalfa field in part C. The defendant and his son testified it was all theirs. The plaintiff said part of it had been left by him when he had plowed up a previous stand. He maintained he had alfalfa there for 3 years before and had previously plowed up small grain to plant the alfalfa. Plaintiff testified that defendant kept moving the temporary fences further west and they were never placed in the same place. He stated defendant kept pushing the line over. The plaintiff said he farmed further east in 1954. There being no fence on

the boundary claimed by the defendant in part C, defendant and Leo Reuter relate the line to which they farmed in part C to fixed objects. They point out that they farmed from the east to a point south of a post in the north quarter line. Leo in particular relates the western extent of defendant's farming to that post. Neither the plaintiff nor the defendant set this post. The fence of which it was a part was installed by the owner of land to the south to mark the boundary of his road. The road at that point is curved. It was built when Leo was away and the rest of the fence was removed before his return. He testified it was in the same place as a former marker existing before he left in 1951. He said that the farmer who installed the fence told him in 1958 the post was close to the proper line. The other marker is an irrigation box on the canal on defendant's south property line. It is east of Blackacre, but the distance from it is repeatedly referred to although no accurate measurements are given. Defendant testified they had farmed to a point 50 or 60 feet west of it.

Several witnesses, living in the vicinity, testified on behalf of the defendant. Most of them relate only what they saw from driving along the road to the south or north of the premises on different occasions. They do not refer to specific dates of their observations. With the exception of one witness who assisted at harvest on one or two occasions, they had not entered upon the premises.

A great deal of the evidence relates to the controversy which arose between the parties at and before the two surveys were run. The parties quarreled at the time. Each tried to build a fence on what he claimed to be the line. Each attempted to take out that built or being built by the other. Each accuses the other of making threats of violence. This testimony has little relevance to the question of adverse possession for the statutory period. It is of some significance as to the defendant's intention of claiming title to the visible line set forth in

his answer. After plaintiff's survey defendant asserted the same was wrong and procured another. The western boundary presently claimed is quite irregular and it is obvious no survey of the original government line would coincide with it.

In McDermott v. Boman, 165 Neb. 429, 86 N. W. 2d 62, this court held: "Either the plaintiff or defendant may, by proper plea, put in issue the fact that certain alleged boundaries or corners are the true ones, or that such have been recognized and acquiesced in by the parties or their grantors for a period of 10 consecutive years.

"The claim of title to land by adverse possession must be proved by actual, open, exclusive, and continuous possession under a claim of ownership for the statutory period of 10 years.

"The claim of adverse possession is founded upon the intent with which the occupant has held possession, and this intent is ordinarily determined by what he has done in respect thereto."

Further rules are set out in Linch v. Nichelson, 178 Neb. 679, 134 N. W. 2d 796, as follows: "The burden of proving adverse possession is on the person asserting it. He must recover upon the strength of his own claim and not upon the weakness of his adversary's title.

"An owner of property does not recognize and acquiesce in the ownership by an adjoining landowner of any part of his property merely because he does not construct his fence on his property line."

We now apply these rules to the evidence outlined in the present case. The defendant claims title to Blackacre by adverse possession which, according to his own testimony, began in 1947 when the fences were moved back at Steele's request. The quarrel concerning the line began in 1963. The burden rests upon the defendant to prove his possession continued uninterrupted for 10 years. His possession for those years must have been actual, open, exclusive, and continuous. It must have

been under claim of ownership. The evidence here is conflicting. A great deal of Blackacre was embraced in the drainage ditch and stub ditch. It was not suitable for growing crops and had little value for pasture. Its principal value appears to have been for drainage. The plaintiff had entered into the area and removed and replaced the check at his own expense. He utilized part of its waters for irrigation. Both parties had at times pastured up to the fence along the trees. The banks of the ditch had at first been subject to being undermined and washed away. It is reasonable to infer the trees were planted to prevent further erosion. The cultivated lands to the north were not enclosed but for brief periods. Plaintiff testified the line was constantly changing and that he had farmed part of the land in question in 1955 or 1956. His alfalfa was growing upon a portion of it in 1963 and had for 3 years previously. The trial court saw and heard the witnesses and found in favor of the plaintiff. " 'While the law requires this court, in determining an appeal in an equity action involving questions of fact, to reach an independent conclusion without reference to the findings of the district court, this court will, in determining the weight of the evidence, where there is an irreconcilable conflict therein on a material issue, consider the fact that the trial court observed the witnesses and their manner of testifying.' " Higgins v. Adelson, 131 Neb. 820, 270 N. W. 502. We conclude, as did this court in Wells v. Tietge, 143 Neb. 230, 9 N. W. 2d 180, that an examination of the record discloses that the defendant failed to prove, by clear and convincing evidence, adverse possession as alleged in his cross-petition.

We find no error in the judgment of the trial court and the same is affirmed.

AFFIRMED.

WHITE, C. J., not participating.