DeEtta Madson et al., appellants, v. TBT Ltd. Liability Co., a Colorado limited liability company, et al., appellees.

686 N.W.2d 85

Filed August 31, 2004. No. A-02-1419.

774

Stephen D. Mossman and April D. Cover, of Mattson, Ricketts, Davies, Stewart & Calkins, for appellants.

Larry R. Baumann, of Kelley, Scritsmier & Byrne, P.C., for appellee TBT Ltd. Liability Co.

CARLSON and MOORE, Judges, and BUCKLEY, District Judge, Retired.

BUCKLEY, District Judge, Retired.

## INTRODUCTION

DeEtta Madson, Margaret B. Westerbuhr, and Delmer Westerbuhr (collectively Westerbuhrs) appeal the trial court's order quieting title to agricultural and recreational property in appellee TBT Ltd. Liability Co. (TBT) based on adverse possession of the property by TBT and its predecessors in interest and on acquiescence to a boundary line. Because we conclude that TBT has not established either the elements of adverse possession by a preponderance of the evidence or the elements of acquiescence to a boundary line, we reverse, and remand with directions to quiet title in Westerbuhrs.

## BACKGROUND

*Description and History of Disputed Property.*

This case involves a dispute over approximately 227 acres of agricultural property (hereinafter the disputed property) located between a fence line to the north and the South Platte River to the south. Both parties own land in an area hereinafter referred to as "Section 19," and the disputed property is located in Section 19. It is undisputed that the main channel of the river formerly ran north of the fence line but that the main channel shifted to the south of the fence line sometime in the late 1960's or early 1970's. A

pond, dug in 1968, is located on the east side of the disputed property and is known as Kuskie's pond.

In 1965, Elmer C. Westerbuhr became record title owner of five lots in the northern portion of Section 19. Elmer began renting the property in 1944 and purchased it in 1965. Elmer died in 1980, and in 1982, his interest was deeded to his wife, Margaret, and to his two children, Delmer and DeEtta. Margaret later deeded her share of the property to the Margaret B. Westerbuhr Living Trust, of which she is trustee.

In 1958, Clifford E. Kuskie inherited from his father land in Section 19, south of Westerbuhrs' property. On November 20, 2001, Kuskie executed a quitclaim deed purporting to convey the disputed property to TBT, a limited liability company composed of Thomas B. Lyons and his two sons. On that same date, Kuskie also executed a warranty deed conveying to TBT the property in Section 19 located south of the river.

In December 2001, Lyons contacted Delmer after Lyons discovered that Delmer had given someone permission to hunt on the disputed property. They disagreed as to whether the boundary between the properties in Section 19 was at the fence line or at the river.

On January 15, 2002, pursuant to Neb. Rev. Stat. § 34-301 (Reissue 1998), Westerbuhrs filed a petition in equity to establish the corners and boundaries of the disputed property. Westerbuhrs alleged that they were record title owners of the following property: "Lots 1, 2, 3, 4, and 5 and the North half of the Northwest Quarter (except railroad and Highway 30) of Section 19, Township 13 North, Range 40 West of the 6[th] P.M., in Keith County, Nebraska, including 227.15 acres of accretion land." They further alleged that 227.15 acres had been added to Lots 1, 2, 3, 4, and 5 through accretion or reliction; that the boundary of the accretive land was the thread, or center, of the South Platte River; that Westerbuhrs had paid all real estate taxes on the disputed property; that the quitclaim deed executed by Kuskie did not transfer a valid property interest to TBT; that Westerbuhrs did not acquiesce to the fence line as a boundary; and that neither TBT nor its predecessors had acquired adverse possession of the disputed property. Westerbuhrs prayed that the court establish the thread of the river as the boundary between

the properties and that title to the disputed property be quieted and confirmed in them.

TBT's answer admitted that the land lying south of the fence line included property of which Westerbuhrs were record title owners; admitted that the South Platte River, through the process of accretion or reliction, had added land to Lots 1, 2, 3, 4, and 5; alleged that the fence line located to the north of the disputed property had been used as the boundary between the parties' properties for more than 10 years and was an "open and notorious claim of ownership by TBT and [its] predecessor"; and alleged that all parties had acquiesced to the fence line as the boundary for more than 10 years. TBT prayed that the court establish the fence line as the boundary between TBT's property and Westerbuhrs' property.

*Real Estate Taxes.*

From 1993 until 2001, Westerbuhrs paid real estate taxes on the disputed property—227.09 accretion acres in 1993 and 1994, 227.1495 accretion acres in 1995, and 227.15 accretion acres from 1996 to 2001. Margaret testified that she would not have paid taxes on the disputed property if she had believed her family did not own it. Delmer testified that Kuskie never reported to him that Westerbuhrs were paying property taxes on property Kuskie claimed to own and that Kuskie did not tell Delmer that Kuskie was claiming the disputed property before Kuskie purported to sell it to TBT. Delmer testified that if he had considered the fence line to be the boundary, he would not have paid taxes on the disputed property.

The state assessor for Keith County testified that she had formerly been first the deputy county assessor and then the county assessor, both for Keith County. According to records of the Keith County assessor's office, the property assessed to Westerbuhrs is legally described as Lots 2, 3, 4, and 5, plus 227.15 acres of accretion ground, while the property assessed to Kuskie is legally described as all property south of the river.

*Disputed Boundary.*

Both parties and their witnesses testified as to the location of the boundary between the parties' properties. Essentially, Westerbuhrs and their witnesses testified that they had always

understood the boundary to be the thread of the main channel of the river, while TBT and its witnesses testified that the fence line was the boundary.

Margaret testified that she never agreed in writing that the fence line was the boundary, nor did she have a conversation with Kuskie about where the boundary was located or allow Kuskie to use the fence line as a boundary. Margaret testified that Kuskie never told her family that he owned the accretion ground south of the fence line. Delmer likewise testified that he never agreed with Kuskie in writing that the fence line was the boundary, nor did he allow Kuskie to use the fence line as a boundary.

Kuskie testified that he had considered the fence line to be the boundary between his property and Westerbuhrs' property ever since the fence was constructed in 1956. Kuskie testified that to his knowledge, his father did not have an agreement with the previous owner of Westerbuhrs' property about the fence line.

The fence on the north side of the disputed property is a three-wire barbed wire fence. It has both wood and steel posts, and there is no gate. There was undisputed testimony by almost every witness that it was easier to step over or climb through the fence than it was to cross the river.

Kuskie helped his father build the fence in 1956. Kuskie testified that he maintained the fence; that Morris Sherman, Kuskie's tenant, maintained it when Sherman was renting the land; and that Westerbuhrs probably also maintained the fence.

Delmer testified that when Elmer farmed the property in Section 19 north of the fence line, Elmer pastured cattle there in the summer and used it for calving in the winter. After Elmer's death, Delmer continued to pasture cattle north of the fence line. Delmer testified that he helped Elmer by fixing the fence annually when it was south of the north channel of the river; that he, with the help of employees, had continued maintaining the fence until trial; and that he considered maintaining the fence to be his responsibility. Delmer testified that he moved the western one-third of the fence farther north several times and that that portion is 100 yards north of its original position. Delmer testified that there used to be a small gate in the fence but that he removed it the third time he moved the fence because there was no reason to have it there. Delmer testified that he had never seen evidence of

anyone from the south side having repaired the fence and that he did not ask Kuskie to help repair the fence.

*Use of Disputed Property.*

Margaret testified that over the years, she had given people permission to hunt on the disputed property by filling out permit forms which she had had printed more than 10 years before trial.

John W. Evert started working for Elmer and Margaret on their farm in approximately 1968, when Evert was a young boy. Evert testified that in 1974, he started working for Delmer and worked for him until May 1983, and that he again worked for Delmer for an unspecified period of time until 1991. Evert testified that while working for Delmer, he had permission from Westerbuhrs to go on the disputed property to hunt ducks, "sink minnows," and pick grapes, currants, and asparagus, as well as for recreation. Evert stated that he was on the disputed property close to 100 times while he worked for Delmer. Evert testified that in approximately 1970 with Delmer's permission, he constructed a nonportable duckblind on the southwest corner of the disputed property, and that he had last used the duckblind in 2001. The duckblind was constructed with posts at each corner, connected by rails, with willows and branches covering it. Evert testified that he started using the duckblind during the 1970's. Evert testified that he did not use the duckblind in 1999 or 2000 but that he used it probably 15 times in 2001.

Evert testified that he and Kuskie's son had been good friends since high school and had hunted together on Kuskie's land "for years." Evert stated that he and Kuskie's son hunted south of the river and on Kuskie's pond, which is on the east side of the disputed property. Evert testified that he and Kuskie's son did not hunt on parts of the disputed property other than Kuskie's pond. Evert testified that he had been to Kuskie's pond hundreds of times and that he had not hunted there for over 10 years. Evert stated that Kuskie and his sons often used to hunt on Kuskie's pond in the 1970's, after the river channel had changed.

Evert testified that no one had ever asked him to leave the disputed property until the first week of December 2001. Evert was hunting at the duckblind with a coworker when Lyons came down the river channel and asked Evert if he knew on whose ground he

was hunting. Evert told Lyons that the ground belonged to Margaret. Lyons told Evert that Lyons had purchased the property and apparently had been misinformed. Evert continued hunting the property after the conversation. Evert testified that he did not tell Margaret about the conversation he had had with Lyons.

Robert Robinson testified that with permission from Delmer, Robinson had hunted geese and ducks on the disputed property since approximately 1993. He testified that he constructed a duckblind on the disputed property, approximately 50 yards south of the fence line and slightly west of center, and that he hunted from the duckblind 10 or 12 times in 2001. Robinson did not testify as to when the duckblind was placed on the disputed property. He stated that he and two or three others carried the duckblind over the fence from Westerbuhrs' pasture. He stated that the duckblind was visible from south of the river channel and that he hunted there without trying to hide his presence. Robinson testified that he had never hunted Kuskie's pond because he had an "agreement" with Kuskie that the pond was a refuge site.

Robinson testified that Kuskie's son did not confront Robinson while he was hunting on the river and ask him to leave. Robinson testified that the only time he spoke to Kuskie about moving a duckblind was regarding a duckblind Robinson had put north of the fence line. Robinson testified Kuskie told him that the location of Robinson's duckblind was interfering with Kuskie's hunting because the duckblind was directly north of Kuskie's goose pit, which was south of the river and directly south of Kuskie's pond, and that the geese would become confused if they heard shots from both Kuskie's goose pit and Robinson's duckblind. Robinson stated that he removed the duckblind.

Robinson testified that after seeing a "no hunting" sign 2 or 3 years prior to trial, he spoke to Delmer and to two game wardens, and that based on what they told Robinson, he continued to hunt on the disputed property.

Steve Westerbuhr, Delmer's son who was 27 years old at the time of trial, testified that he used the disputed property for hunting and recreation. He testified that he was not a "big hunter" and had hunted three or four times a year throughout his life. Steve stated that he had been on the disputed property 40 or more times with permission from his family, that he had been

going to the disputed property for as long as he could remember or approximately 20 years, and that he had last been on the disputed property 3 years prior to trial. He stated that he did not need permission from anyone else to be south of the fence line because it was his family's ground and that he never tried to hide his presence from anyone. Steve testified that no one had ever asked him to leave the disputed property. Steve stated that he never saw Kuskie or anyone else, other than members of Steve's family, on the disputed property, nor did he see evidence that anyone had been in that area. Steve testified that when he went to the river, he reached it by coming from the north and stepping over or climbing through the fence.

Delmer testified that he had given permission to others, including many relatives, Evert, and Robinson, to hunt on the disputed property and that his brother-in-law hunted on the disputed property almost every year. Delmer testified that he never sought permission from Kuskie or Lyons before allowing people to hunt on the disputed property because Delmer did not believe he needed such permission.

Before Delmer went to college in 1969 and after college when he farmed in Section 19, he had hunted with several others on the west end of the disputed property. He stated that he had hunted less frequently during the 10 years prior to trial than he had in the past. Delmer testified that 2 to 12 times a year, he "still" enjoys spending time south of the fence line to the river to relieve stress. Delmer did not specify how long he had been utilizing the disputed property to relieve stress, but he testified that his stress was caused by his job at the feedlot, where he has worked since December 1992. Delmer testified that he never tried to hide his presence on the disputed property and that he reached the property by stepping over or climbing through the fence.

Delmer testified that he was aware Sherman used to pasture cattle on Kuskie's property and had seen Sherman's cattle on the disputed property about three or four times but that Delmer did not contact Sherman about the matter. Delmer testified that he did not think he was giving up the disputed property by not calling Sherman about his cattle. Delmer testified that the pasture on the disputed property was not very valuable and that building a fence along the river channel to keep Sherman's cattle off the

disputed property would not have been worth the effort. Delmer stated that the disputed property was primarily valuable for hunting and recreation.

Delmer testified that before the river channel shifted to the south of the fence line, Kuskie used to hunt on the land north of the fence line and south of the channel, and that the remains of the duckblind Kuskie used were still visible. Kuskie testified that he never hunted north of the fence line.

Kuskie testified that he pastured cattle south of the fence line from the 1960's until 1981 or 1982 and that the cattle went on the disputed property. Kuskie testified that for about 15 to 20 years starting in 1980, he leased the land in Section 19 to Sherman for pasture. Sherman and Kuskie both testified that Sherman's cattle went on the disputed property. Kuskie testified that he had never seen Delmer, Margaret, or Elmer south of the fence and that Westerbuhrs never told him that they owned the disputed property.

Kuskie testified that during the 10 years preceding trial, he had given permission to others to hunt on the disputed property, but that when he had encountered people hunting the disputed property without his permission, he had asked them to leave. Kuskie stated that 2 or 3 years prior to trial, Robinson hunted on the disputed property without Kuskie's permission. Kuskie further stated that he asked Robinson who had given him permission to hunt the disputed property, that Robinson replied he was hunting on Westerbuhrs' property, that Kuskie then told Robinson the property was Kuskie's, and that Robinson left. Kuskie testified that 3 or 4 years before trial, Robinson telephoned him, and that as a result of the call, Kuskie confronted a man hunting in a duckblind on the disputed property and asked the man to leave. The man left the disputed property through the fence, which he had cut to accommodate a portable duckblind and which he did not repair.

Lyons testified that in 1997, he purchased from Kuskie property immediately to the east of the disputed property, and that Lyons was on that property every other week. He stated that from the time of that purchase until 2001 when he purchased property in Section 19 from Kuskie, he observed Kuskie patrolling Section

19 approximately 75 percent of the time but saw no other person. Lyons testified that during these observations, Kuskie was on disputed property about half of the time.

Lyons testified that he had been on the disputed property a total of 10 times before he purchased it, 5 times to retrieve ducks he had shot from his property to the east and 5 times to inspect the disputed property during the due diligence period allowed by the purchase agreement.

Lyons testified that since he purchased the western property from Kuskie in 2001, he had been on that property 15 times, and that he started hunting ducks on the property on December 2, 2001. Lyons testified that he had given permission to his sons and his colleague to be on the disputed property. He stated that since the purchase in 2001, he saw someone else hunting south of the fence line only once, and that that person was Evert. Lyons testified that he informed Evert that the disputed property had been deeded to Lyons.

Rodney E. Lanka, who had done construction work for Lyons, testified that he had never observed anyone other than Lyons or his associates on the disputed property, nor had he heard gunshots coming from that area. Lanka stated that he hunted in Section 19 occasionally with Lyons, Lyons' sons, and Lyons' friends, but that he had not hunted on the disputed property. Lanka testified that Lyons told him that if Lanka ever saw people on the disputed property, he was to "run them off," but that he had never had occasion to do that.

Jeffrey L. Pastore testified that he hunted with Lyons often and was with Lyons when he encountered Evert. Pastore testified that Evert was hunting from a duckblind which was visible from the south side of the river channel. He stated that he had been on the disputed property four times and had not encountered anyone other than Evert that one time.

*Trial Court's Findings.*

After viewing the disputed property, the trial court found that TBT had proved the elements of adverse possession and that Westerbuhrs had acquiesced to the fence line as the boundary. The court therefore quieted title to the disputed property in TBT.

## ASSIGNMENTS OF ERROR

Westerbuhrs assign, condensed and restated, that the trial court erred (1) in failing to find that Westerbuhrs had established ownership of the disputed property through the theory of accretion, (2) in finding that TBT established the elements of adverse possession, and (3) in finding that Westerbuhrs acquiesced to the fence line as the boundary.

## STANDARD OF REVIEW

An action to ascertain and permanently establish corners and boundaries of land under § 34-301 is an equity action. *Anderson v. Cumpston*, 258 Neb. 891, 606 N.W.2d 817 (2000). In an appeal from an equity action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided that where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

## ANALYSIS

*Ownership Through Accretion or Reliction.*

On appeal, Westerbuhrs argue that they established ownership of the disputed property through the theory of accretion. A party who seeks to have title in real estate quieted in him or her on the ground that it is accretion to land to which he or she has title has the burden of proving the accretion by a preponderance of the evidence. *State v. Matzen*, 197 Neb. 592, 250 N.W.2d 232 (1977).

TBT admitted in its answer that the disputed property is composed of land to which the Westerbuhrs are record title owners, as well as land added by accretion or reliction to Westerbuhrs' land. Because admissions contained in pleadings, answers, and replies are judicial in nature and waive all controversy concerning the matter admitted, see *Schmid v. Malcolm Sch. Dist.*, 233 Neb. 580, 447 N.W.2d 20 (1989), we conclude that Westerbuhrs sustained their burden of proving accretion.

Under Nebraska law, title to riparian land, that is, land with water flowing over it or along its border, runs to the thread,

or center, of the contiguous stream. See *Cofer v. Kuhlmann*, 214 Neb. 341, 333 N.W.2d 905 (1983). See, also, *Saunders Cty. v. Metropolitan Utilities Dist.-A*, 11 Neb. App. 138, 645 N.W.2d 805 (2002). The thread of a channel is the line which would give the landowners on either side access to the water, whatever its stage might be and particularly at its lowest flow. *Anderson v. Cumpston, supra*. The thread of the stream is that portion of a waterway which would be the last to dry up. *Id*. Where the thread of the main channel of a river is the boundary line between two estates and it changes by the slow and natural processes of accretion and reliction, the boundary follows the channel. *Ziemba v. Zeller*, 165 Neb. 419, 86 N.W.2d 190 (1957).

Here, the county assessor has considered the main channel of the river to be the boundary since at least 1993, and the assessor's "legal description" of the land owned by TBT's predecessor is all land south of the river. Westerbuhrs and their witnesses testified that they had always considered the main channel to be the boundary and that they used the property immediately north of the main channel. Thus, there is evidence that the main channel of the river is the boundary between the Westerbuhrs' and TBT's properties, and under Nebraska law, the boundary follows any changes in the river channel and remains at the thread of the river. There can be no question that Westerbuhrs sustained their burden of proof with respect to where the boundary line should be, absent proof by TBT that the boundary is elsewhere due to adverse possession or acquiescence.

*Adverse Possession.*

■ A party claiming title through adverse possession must prove by a preponderance of the evidence that the adverse possessor has been in (1) actual, (2) continuous, (3) exclusive, (4) notorious, and (5) adverse possession under a claim of ownership for the statutory period of 10 years. *Wanha v. Long*, 255 Neb. 849, 587 N.W.2d 531 (1998).

■ Clearly, regarding the agricultural purpose of pasturing cattle, Kuskie—TBT's predecessor in interest—or his tenant had exclusive use of the disputed property from the 1960's until the late 1990's because Westerbuhrs never pastured cattle on the disputed property or used it for any other agricultural purpose.

However, as Delmer and Lyons testified, the disputed property was also used and valued for recreation and hunting, and the party claiming adverse possession must prove exclusive use for every purpose for which the land is adapted. See *Hutson v. The Rush Creek Land and Livestock Co.*, 206 Neb. 658, 294 N.W.2d 374 (1980).

Evidence of adverse possession must show the intention of the claimant to appropriate and use the property as his or her own to the exclusion of all others. *Nye v. Fire Group Partnership*, 265 Neb. 438, 657 N.W.2d 220 (2003). The law does not require that adverse possession be evidenced by complete enclosure and 24-hour use of the property for the purposes for which it is adapted, but it is sufficient if the land is used continuously for the purposes to which it may be adapted. See *id.* However, possession must be exclusive for the required 10-year period, and if the occupier shared possession with the title owner, the occupier may not obtain title by adverse possession. See *id.* Where both parties have used the property in dispute, there can be no exclusive possession on the part of one party. *Rush Creek Land & Live Stock Co. v. Chain*, 255 Neb. 347, 586 N.W.2d 284 (1998). See, also, *Nye v. Fire Group Partnership, supra* (summary judgment reversed because there was evidence that both parties used disputed property, constituting genuine issue of material fact with regard to exclusivity); *Wanha v. Long, supra* (elements of adverse possession established where both parties used disputed property, but adverse possessor used it for 10-year period during which other party did not use it); *Thornburg v. Haecker*, 243 Neb. 693, 502 N.W.2d 434 (1993) (exclusive possession not found where both parties used disputed property and discussed with one another their confusion over where boundary between their properties was); *Cofer v. Kuhlmann*, 214 Neb. 341, 333 N.W.2d 905 (1983) (where both parties used disputed property on various occasions, there was no evidence that party claiming adverse possession ever had exclusive possession).

There is evidence that TBT or Kuskie used the disputed property for hunting from the 1970's until 2001; however, there is also testimony that Westerbuhrs and their invitees used the disputed property for hunting and recreation from the late 1960's until 2001.

Delmer hunted on the disputed property between approximately 1968 and 2001. Margaret and Delmer permitted others to hunt there, including Delmer's brother-in-law, who hunted there almost annually. Delmer testified that he went to the disputed property 2 to 12 times a year to relieve stress, but he did not specify how many years he had done that.

From approximately 1970 until 2001, with Delmer's permission, Evert had a permanent duckblind on the west end of the disputed property. There is testimony that he used the duckblind at least in the 1970's and approximately 15 times during 2001. Evert testified that when he hunted with Kuskie's son, as he often did over the years, they hunted on Kuskie's pond, which was on the east end of the disputed property. Evert testified that with Westerbuhrs' permission while he was working for Delmer, which was from 1974 to 1983 and then again for an unspecified period of time until 1991, Evert went on the disputed property for hunting and recreation approximately 100 times. In 2001, Evert was confronted while on the disputed property by Lyons, who told Evert that Lyons had purchased the property, and Evert informed Lyons that the disputed property belonged to Westerbuhrs.

There is evidence that between approximately 1980 and 1998, Delmer's son, Steve, used the disputed property for hunting and recreation and was on the property 40 or more times during that period. Steve testified that he did not ask for permission to use the disputed property because the property belonged to his family.

Between approximately 1993 and 2001, Robinson hunted on the disputed property with permission from Delmer and used a portable duckblind there 10 or 12 times in 2001.

The trial court acknowledged that both parties used the disputed property for hunting, stating that "the evidence on the issue of hunting is evenly balanced, and does not favor either of the parties." The trial court also concluded that Westerbuhrs had not shown that they shared possession of the land with Kuskie because they did not communicate their use of the disputed property to Kuskie. We recognize that where credible evidence is in conflict on a material issue of fact, we consider and may give weight to the fact that the trial judge observed the witnesses, viewed the property, and accepted one version of the

facts rather than another. See *Anderson v. Cumpston*, 258 Neb. 891, 606 N.W.2d 817 (2000). However, in acknowledging that the evidence regarding hunting is evenly balanced between the parties, a finding with which we agree, the trial court invalidated its own conclusion that TBT had established exclusive possession of the disputed property. Moreover, it is irrelevant whether Westerbuhrs communicated their use of the disputed property to Kuskie. The fact Westerbuhrs used the property is the material point, and because of the timing of that use, neither TBT nor its predecessor had exclusive possession of the property for the required 10-year period. Therefore, on a de novo review, we conclude that the trial court erred in quieting and confirming title to the disputed property in TBT based on the theory of adverse possession.

*Mutual Recognition and Acquiescence.*

Westerbuhrs assign that the trial court erred in finding that they had acquiesced to the fence line as the boundary. As with adverse possession, the statutory period required for acquiescence is 10 years. See, § 34-301; *Swanson v. Dalton*, 178 Neb. 55, 131 N.W.2d 704 (1964). To claim a boundary line by acquiescence, both parties must have knowledge of the existence of a line as the boundary. *Spilinek v. Spilinek*, 215 Neb. 35, 337 N.W.2d 122 (1983). It is insufficient for one party to merely establish a line and take possession up to that line. See *Bender v. James*, 212 Neb. 77, 321 N.W.2d 436 (1982). For acquiescence to operate, the other party must assent, by words, conduct, or silence, to a line as the boundary. See *Spilinek v. Spilinek, supra.* " 'In order to establish a boundary by acquiescence, it is not necessary that the acquiescence should be manifested by a conventional agreement, but recognition and acquiescence must be mutual, and both parties must have knowledge of the existence of a line as a boundary line.' " *Hausner v. Melia*, 212 Neb. 764, 771, 326 N.W.2d 31, 36 (1982), quoting 11 C.J.S. *Boundaries* § 79 (1938).

The record shows that Westerbuhrs did not assent, by their words or actions, to the fence line as the boundary. They and their witnesses testified that they understood the boundary between the two properties to be the river, not the fence line. Westerbuhrs had

no agreements or conversations with Kuskie about the fence line being the boundary between the properties. Westerbuhrs and their invitees used the property south of the fence line for hunting and recreation. From 1993 until 2001, Westerbuhrs paid real estate taxes on the property south of the fence line.

Delmer testified that he had seen Sherman's cattle grazing north of the river and south of the fence line but that he did not say anything to Sherman about it because he did not think that allowing Sherman's cattle to graze there constituted giving up the disputed property. Delmer also testified that Kuskie had a duckblind north of the fence line at one time.

Westerbuhrs repaired the fence annually and moved portions of it, but considering that Westerbuhrs pastured cattle north of the fence line, it was practical for them to maintain the existing fence as a barrier for their cattle, regardless of where the boundary line was located. See *Foos v. Reuter*, 180 Neb. 301, 142 N.W.2d 552 (1966) (constructing fence that is not on property line does not constitute acquiescence in ownership of property by adjoining landowner), *overruled on other grounds, Wiedeman v. James E. Simon Co., Inc.*, 209 Neb. 189, 307 N.W.2d 105 (1981).

TBT makes much of the fact that there was no gate in the fence or set of stairs over it. However, almost every witness testified that it was easier to step over or climb through the fence than it was to cross the river.

On our de novo review, we conclude that the trial court erred in finding that the Westerbuhrs acquiesced to the fence line as the boundary.

## CONCLUSION

For the foregoing reasons, we find that Westerbuhrs established ownership of the disputed property and that TBT did not establish the elements of adverse possession or acquiescence. We therefore reverse the decision of the trial court and remand the cause with directions to quiet title to the disputed property in Westerbuhrs, establishing the boundary line at the thread of the South Platte River.

REVERSED AND REMANDED WITH DIRECTIONS.