Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
01/05/2024 09:07 AM CST

Judith Puncochar, appellant, v.
Jesse D. Rudolf et al., appellees.

___ N.W.2d ___

Filed January 5, 2024.    No. S-23-072.

1. **Equity: Boundaries: Appeal and Error.** An action to ascertain and permanently establish corners and boundaries of land under Neb. Rev. Stat. § 34-301 (Reissue 2016) is an equity action.
2. **Equity: Appeal and Error.** On appeal from an equity action, an appellate court decides factual questions de novo on the record and, as to questions of both fact and law, is obligated to reach a conclusion independent of the trial court's determination.
3. **Summary Judgment: Appeal and Error.** An appellate court reviews a district court's grant of summary judgment de novo.
4. ____: ____. An appellate court affirms a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.
5. ____: ____. In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted, and gives that party the benefit of all reasonable inferences deducible from the evidence.
6. **Waters.** Land, to be riparian, must have the stream flowing over it or along its border.
7. ____. The basis of the riparian doctrine, and an indispensable requisite of it, is actual contact of the land with the water.
8. **Waters: Boundaries.** Under Nebraska law, title to riparian lands runs to the thread of the contiguous stream.
9. **Waters: Boundaries: Words and Phrases.** The thread, or center, of a channel is the line which would give the landowners on either side access to the water, whatever its stage might be and particularly at its lowest flow.

10. ____ : ____ : ____. Where the thread of the main channel of a river is the boundary line between two estates and it changes by the slow and natural processes of accretion and reliction, the boundary follows the channel.

11. **Waters: Boundaries.** Meander lines of a river as established by the original government survey are not boundary lines unless made so by the instrument of conveyance; instead, the waters themselves constitute the real boundary.

12. ____ : ____. Meander lines are run for the purpose of ascertaining the exact quantity of land to be charged for and not for the purpose of limiting the title of the grantee to such meander lines.

13. **Boundaries: Evidence: Proof.** Government corners fixed by the government survey at the time of the original survey furnish the best evidence of the true location of the corners; in the absence of such corners, or of satisfactory proof of their location, the field notes of the government survey (including its plats, if any) furnish prima facie evidence from which the true corners and lines may be located.

14. **Boundaries: Deeds: Conveyances.** When lands are granted according to an official plat of the survey of such lands, the plat itself, with all of its notes, lines, descriptions, and landmarks, becomes as much a part of the grant or deed by which the lands are conveyed, and controls as if such descriptive features were written on the face of the grant or deed itself.

Appeal from the District Court for Howard County: Karin L. Noakes, Judge. Affirmed.

David A. Domina, of Domina Law Group, P.C., L.L.O., for appellant.

Stephen D. Mossman and Jacob C. Garbison, of Mattson Ricketts Law Firm, for appellees.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Cassel, J.

## I. INTRODUCTION

In this boundary dispute action, Judith Puncochar appeals from an adverse summary judgment. She contends that the

original government survey described her tract of property by metes and bounds on all four sides. Because we determine that the original survey showed the tract had one riparian side, we affirm the district court's entry of summary judgment.



## II. BACKGROUND

The dispute on appeal centers on the boundaries of a lot in Township 14 North, Range 10 West of the 6th P.M. (Township) located in Howard County, Nebraska. The lot, Government Lot 1 (GL1), is in Section 15 of the Township, as shown by the arrow in the excerpt below.

The owner of GL1, Puncochar, sued to determine the boundary between her land and Government Lot 7 (GL7)—portions of which are owned by Jesse D. and Elizabeth A. Rudolf, husband and wife, and by Brian V. Sack and Cathryn A. Sack. We will refer to the Rudolfs and the Sacks collectively as "the GL7 Owners," but in doing so, we are mindful that only the Rudolfs and Brian Sack filed a counterclaim and joined in the motion for summary judgment. (Cathryn Sack filed an answer generally denying the allegations of the complaint; she waived filing a brief on appeal.) Puncochar claimed to own land on both the east and west sides of the Middle

Loup River, and she alleged that GL7 did not include accretion. Puncochar asked the court to establish a boundary for her property in metes and bounds.

The GL7 Owners filed counterclaims to establish the corners and boundaries of the property in dispute. They requested that the eastern boundary to GL7 be established as the thread of the Loup River. The counterclaims alleged that over the past 150 years, the banks of the river abutting GL7 had moved gradually to the east, uncovering new land to the river's west.

The parties filed cross-motions for summary judgment. They agreed that judicial determination of the legal boundary of GL1 would resolve all claims and counterclaims.

After receiving evidence, discussed in more detail as necessary in the analysis section, the court entered summary judgment establishing the boundary between GL1 and GL7 as the thread of the stream of the Middle Loup River, a branch of the Loup River. The court stated that GL1 was not legally described according to Puncochar's claimed metes and bounds description on any survey or in any survey notes submitted to the court.

The court noted that the original Government Land Office survey showed GL1 to border the river on its western edge, and the court declared that the original survey showed GL1 to be riparian property. The court stated that "[a]s a matter of law, the boundary of a lot adjacent to a meander line/river is presumed to lay within the river, absent a declaration in the conveyance." Because the original survey was the best evidence of the western boundary of GL1 and because it showed that GL1 was riparian property, the court determined that title to GL1 "runs west to the thread of the river and its western boundary follows the channel." In crafting the court's decree (styled as a summary judgment), it attached a series of survey plats developed by a surveyor employed by the GL7 Owners, which the parties describe as the "Blodgett survey."

Puncochar filed a timely appeal, which we moved to our docket.[1]

## III. ASSIGNMENT OF ERROR

Puncochar assigns three errors, which we consolidate and restate as alleging that the court erred in determining that the original government survey described GL1 as riparian.

## IV. STANDARD OF REVIEW

[1,2] An action to ascertain and permanently establish corners and boundaries of land under Neb. Rev. Stat. § 34-301 (Reissue 2016) is an equity action.[2] On appeal from an equity action, an appellate court decides factual questions de novo on the record and, as to questions of both fact and law, is obligated to reach a conclusion independent of the trial court's determination.[3]

[3-5] An appellate court reviews a district court's grant of summary judgment de novo.[4] An appellate court affirms a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.[5] In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted, and gives that party the benefit of all reasonable inferences deducible from the evidence.[6]

---

[1] See Neb. Rev. Stat. § 24-1106(3) (Cum. Supp. 2022).

[2] *Anderson v. Cumpston*, 258 Neb. 891, 606 N.W.2d 817 (2000).

[3] *Pine Tree Neighborhood Assn. v. Moses*, 314 Neb. 445, 990 N.W.2d 884 (2023).

[4] *Id.*

[5] *Id.*

[6] *Id.*

## V. ANALYSIS

### 1. Judicial Notice Request

In Puncochar's brief, she asks this court to take judicial notice of a publication that can be accessed electronically. The publication, found on the website of the U.S. Bureau of Land Management, concerns instructions to surveyors of U.S. public lands published in 1855. Puncochar did not bring this publication to the district court's attention. Although judicial notice of adjudicative facts may be taken at any stage of the proceeding,[7] we decline to take judicial notice of the contents of this publication.

### 2. Principles of Law

[6,7] Land, to be riparian, must have the stream flowing over it or along its border.[8] The basis of the riparian doctrine, and an indispensable requisite of it, is actual contact of the land with the water.[9]

> "Land is riparian by virtue of the fact that it is so located in respect to a watercourse or lake that the possessor of it has lawful access to the water for his private use. The mere fact that a parcel of land is close by or adjacent to the water does not make that land riparian when the water itself is on another's land, for in such case there is no access to the water, for private use at least, without intruding on the land on which the water lies."[10]

[8-10] The parties agree that if GL1 was riparian at the time it was surveyed, the boundary between GL1 and GL7 is at the thread of the river. This is because under Nebraska law, title to riparian lands runs to the thread of the contiguous stream.[11]

---

[7] Neb. Rev. Stat. § 27-201(1) and (6) (Reissue 2016).

[8] *Stratbucker v. Junge*, 153 Neb. 885, 46 N.W.2d 486 (1951).

[9] *Id.*

[10] *Id.* at 890, 46 N.W.2d at 488, quoting Restatement of Torts § 843 comment *d.* (1939).

[11] See *Anderson v. Cumpston, supra* note 2.

The thread, or center, of a channel is the line which would give the landowners on either side access to the water, whatever its stage might be and particularly at its lowest flow.[12] Where the thread of the main channel of a river is the boundary line between two estates and it changes by the slow and natural processes of accretion and reliction, the boundary follows the channel.[13] A treatise explains the reasoning behind the entitlement to accretions:

> The right to accretions frequently is said to be founded on a riparian owner's right of continued access to the watercourse. If the strips of land accreting to the shoreline were owned by others than the abutting owners, the consequence would be a substantial and unjust decrease in the value of riparian lands.[14]

[11,12] The parties also agree that a meander line is not a boundary between properties. Meander lines of a river as established by the original government survey are not boundary lines unless made so by the instrument of conveyance; instead, the waters themselves constitute the real boundary.[15] Meander lines are run for the purpose of ascertaining the exact quantity of land to be charged for and not for the purpose of limiting the title of the grantee to such meander lines.[16]

The parties further agree that the original government land survey is controlling. Puncochar asserts that the government survey, plat (Plat No. 1058), and patent are not open to challenge by collateral attack. The GL7 Owners likewise "agree that the plat and field notes established by a government

---

[12] *Id.*

[13] *Id.*

[14] Richard S. Harnsberger & Norman W. Thorson, Nebraska Water Law & Administration § 7.02 at 330 (1984).

[15] *In re Freeholders Petition*, 210 Neb. 583, 316 N.W.2d 294 (1982).

[16] See, *Hardin v. Jordan*, 140 U.S. 371, 11 S. Ct. 808, 35 L. Ed. 428 (1891); *Summerville v. Scotts Bluff County*, 182 Neb. 311, 154 N.W.2d 517 (1967).

survey are conclusive."[17] Puncochar concedes that "[t]he title determination turns on documents, not a veracity contest."[18]

[13,14] Government corners fixed by the government survey at the time of the original survey furnish the best evidence of the true location of the corners; in the absence of such corners, or of satisfactory proof of their location, the field notes of the government survey (including its plats, if any) furnish prima facie evidence from which the true corners and lines may be located.[19] When lands are granted according to an official plat of the survey of such lands, the plat itself, with all of its notes, lines, descriptions, and landmarks, becomes as much a part of the grant or deed by which the lands are conveyed, and controls as if such descriptive features were written on the face of the grant or deed itself.[20]

### 3. Additional Facts

#### (a) Survey Plat

In 1867, a surveyor created an official government survey of the Township, recorded as Plat No. 1058. The Government Land Office approved the survey in 1868.

Plat No. 1058 showed GL1 to be composed of 53 acres and to be east of the Loup River. It depicted GL7 to be 33 acres directly west across the river from GL1. The plat shows the Loup River runs through the Township in a northeasterly direction.

The right-hand side of Plat No. 1058 captured the meanders of the Loup River. Because the river runs south to north, the references on the plat to "Down the left bank" and "Down right bank" actually run south to north on the plat. The course of the meanders was marked on the plat by numbered posts.

---

[17] Brief for appellees at 12.

[18] Brief for appellant at 5.

[19] *State v. Cheyenne County*, 123 Neb. 1, 241 N.W. 747 (1932).

[20] See *Cragin v. Powell*, 128 U.S. 691, 9 S. Ct. 203, 32 L. Ed. 566 (1888).

### (b) Accompanying Field Notes

The surveyor recorded handwritten survey notes in connection with his work. Although the notes are at times difficult to read, they show the surveyor's marking of various corners and crossing of the river. The surveyor recorded meanders of the river. The subscript numbers contained in the field notes refer to the post numbers that are set forth on the right side of Plat No. 1058. To the extent Puncochar makes an argument based on the content of the field notes, we will address the argument and the notes in connection with our resolution.

### (c) Patent

A patent filed in 1884 showed that "Lot 1" in the Township was included within the land grants made by the U.S. government to the Union Pacific Railroad Company. The patent showed "Lot 1" to be composed of 53 acres; it did not set forth any measured boundaries.

### 4. Resolution

Puncochar's principal contention is that the original government survey generated a metes and bounds description of GL1, with four measured and linear sides, rather than tract with a riparian side. We disagree.

Plat No. 1058 and the field notes show GL1 to be riparian. The plat does not depict anything other than a riparian tract. It shows GL1, as well as GL7, abutting the river. The surveyor's field notes, from which the plat was drawn, are consistent with GL1's having a riparian side. Further, the depiction of the meandering of the river reinforces that the tract is riparian.

The field notes do not support Puncochar's argument for a metes and bounds description. The field notes twice mention the corner to Sections 10, 11, 14, and 15. This corner would be the northeast corner of GL1. The notes also refer to the quarter section corner to Sections 14 and 15. Later, the notes discuss intersecting the left bank of the river for a temporary corner, setting a flag on the right bank of the river

in line between Sections 10 and 15, running a base line from the temporary corner, and calculating the distance across the river. The surveyor crossed the river and, in place of the flag, set a post for a temporary corner. The notes mention: "26.01 [chains] Right bank Loup River runs N5°E[.] Set post deposit charred stake raised a mound of earth with pits as per instructions for a corner to fractional Sections 10 & 15." Plat No. 1058 shows 26.01 chains from the northeast corner of GL1 to the right bank of the river. This point is a meander corner, which is defined as "[a] corner established at the intersection of standard, township or section lines with the meander line near banks of navigable streams or any meanderable body of water." The point corresponds with post 20 contained on Plat No. 1058's tracking of the meanders of the river. The notes likewise set forth the meanders on the left and right bank of the river through Section 15, which match with the posts depicted on Plat No. 1058 and listed on the right side of the plat. Contrary to Puncochar's argument, neither Plat No. 1058 nor the notes establish a measured boundary for the west side of GL1.

Nor does the recital of 53 acres in the patent conveying GL1 support the existence of a fixed, rather than a riparian, boundary. The patent's recital matches the number of 53 acres specified on Plat No. 1058. Whether the acreage was actually 53 acres at the time of the original government survey, or some greater or lesser number, matters not. The original survey, depicting the riparian boundary, which became a part of the patent, controlled. But it gave no assurance that the size of the riparian property would remain fixed at any particular size. *Every* government lot depicted on Plat No. 1058 adjoining the "Loup River" recites an acreage. Such recitals in no way conflict with those lots' riparian character.

Puncochar also relies on a survey performed by a surveyor she employed purporting to develop a description relying on the original survey field notes. This represents an attempt to supplement the field notes to provide a metes and bounds

description where the original government survey did not. The district court was not persuaded that this had any legal effect, and neither are we.

Having determined that GL1 is riparian, we affirm the district court's entry of summary judgment establishing the boundary between GL1 and GL7 as the thread of the stream of the Middle Loup River. Thus, the boundaries of GL1 in Township 14 North, Range 10 West of the 6th P.M. in Howard County, Nebraska, are fixed as follows: (1) the northeast corner, by the intersection of Sections 10, 11, 14, and 15 in said Township; (2) the southeast corner, by the corner established in the original government survey at the intersection of the southeast corner of GL1 and the northeast corner of Government Lot 2; (3) the northwest corner, by the intersection of the north line of GL1 with the thread of the stream of the Middle Loup River; and (4) the southwest corner, by the intersection of the south line of GL1 with the thread of the stream of the Middle Loup River. The western boundary of GL1 is established by the thread of the stream between the northwest and southwest corners of GL1 thus confirmed.

## VI. CONCLUSION

Because the original government survey showed GL1 to be riparian, we affirm the grant of summary judgment in favor of the GL7 Owners and confirm the boundaries of GL1 as set forth above.

AFFIRMED.