Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/12/2024 09:09 AM CDT

Tegra Corporation, individually and on behalf of
Lite-Form Technologies, L.L.C., appellant, v.
Patrick E. Boeshart et al., appellees.

___ N.W.3d ___

Filed July 12, 2024.    No. S-23-666.

1. **Corporations: Appeal and Error.** An appellate court reviews de novo
   on the record a district court's determination pursuant to Neb. Rev.
   Stat. § 21-168(e) (Reissue 2022) that a special litigation committee
   "conducted its investigation and made its recommendation in good
   faith, independently, and with reasonable care." Under such a review,
   an appellate court reaches a conclusion independent of the findings of
   the trial court, provided that where credible evidence is in conflict on a
   material issue of fact, the appellate court considers and may give weight
   to the fact that the trial judge heard and observed the witnesses and
   accepted one version of the facts rather than another.
2. **Corporations.** The purpose of a special litigation committee is to inves-
   tigate the claims made in the action and determine whether pursuing the
   action is in the best interests of the company.
3. **Proof.** The burden of proof is upon the party holding a confidential or
   fiduciary relationship to establish the fairness, adequacy, or equity of the
   transaction with the party with whom he or she holds such relation.

Appeal from the District Court for Dakota County, Bryan
C. Meismer, Judge. Affirmed in part, and in part reversed and
remanded for further proceedings.

Mathew T. Watson and Erin R. Robak, of McGill, Gotsdiner,
Workman & Lepp, P.C., L.L.O., for appellant.

Scott D. Jochim and Josiah J. Shanks, of Croker Huck Law
Firm, for appellees.

Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Papik, J.

Tegra Corporation, a minority interest holder in Lite-Form Technologies, L.L.C. (the LLC), appeals a district court order that dismissed derivative claims it filed on behalf of the LLC against Patrick Boeshart, the LLC's manager and president, and Patrick's wife, Sandra Boeshart, who served as the LLC's bookkeeper and office manager. Tegra alleged that the Boesharts, who also held substantial direct and indirect interests in the LLC, had used their positions in the LLC to enrich themselves to the detriment of the LLC. The district court dismissed the derivative claims based on its conclusion that a special litigation committee (SLC) appointed pursuant to Neb. Rev. Stat. § 21-168 (Reissue 2022) had in good faith, independently, and with reasonable care investigated Tegra's claims and recommended that the claims be settled on terms approved by the SLC. We conclude that the district court erred in finding that the SLC carried out its role with reasonable care, and we reverse the district court's dismissal of the derivative claims and remand the cause for further proceedings in conformity with this opinion. We affirm the district court's dismissal of other claims, which Tegra does not challenge on appeal.

## I. BACKGROUND

### 1. Derivative Action Initiated

This is the second time this case has been before us on appeal. As we will mention again below, we dismissed an earlier appeal in this case as premature. See *Tegra Corp. v. Boeshart*, 311 Neb. 783, 976 N.W.2d 165 (2022). We explained in greater detail in our earlier opinion that Tegra and the Boesharts held ownership interests in the LLC. Both Tegra and the Boesharts held direct interests in the LLC, and both also owned interests in another entity that held an ownership interest in the LLC. Additionally, Patrick acted as manager and

president of the LLC, and Sandra worked as bookkeeper and office manager.

Tegra, on behalf of the LLC, filed a derivative action against Patrick, Sandra, and other entities they are alleged to have owned and controlled, which hereafter we will refer to collectively as "the Boesharts." The lawsuit alleged the Boesharts breached fiduciary duties, misappropriated and wasted corporate assets, converted corporate assets, and were unjustly enriched to the detriment of the LLC. Tegra also sued the Boesharts in Tegra's individual capacity based on allegations that the Boesharts had wrongfully withheld information from Tegra; those claims are not at issue in this appeal. We describe Tegra's pertinent derivative claims below.

## 2. SLC APPOINTED PURSUANT TO § 21-168, COMPLETES REPORT

After Tegra filed its lawsuit, Patrick appointed an SLC under the authority granted by § 21-168. Section 21-168 provides, in relevant part:

> (a) If a limited liability company is named as or made a party in a derivative proceeding, the company may appoint [an SLC] to investigate the claims asserted in the proceeding and determine whether pursuing the action is in the best interests of the company. If the company appoints [an SLC], on motion by the [SLC] made in the name of the company, except for good cause shown, the court shall stay discovery for the time reasonably necessary to permit the [SLC] to make its investigation. . . .
>
> . . . .
>
> (d) After appropriate investigation, [an SLC] may determine that it is in the best interests of the limited liability company that the proceeding:
>
> (1) continue under the control of the plaintiff;
> (2) continue under the control of the [SLC];
> (3) be settled on terms approved by the [SLC]; or
> (4) be dismissed.

(e) After making a determination under subsection (d) of this section, [an SLC] shall file with the court a statement of its determination and its report supporting its determination, giving notice to the plaintiff. The court shall determine whether the members of the [SLC] were disinterested and independent and whether the [SLC] conducted its investigation and made its recommendation in good faith, independently, and with reasonable care, with the [SLC] having the burden of proof. If the court finds that the members of the [SLC] were disinterested and independent and that the [SLC] acted in good faith, independently, and with reasonable care, the court shall enforce the determination of the [SLC]. Otherwise, the court shall dissolve the stay of discovery entered under subsection (a) of this section and allow the action to proceed under the direction of the plaintiff.

Patrick appointed Cody Carse as a single-member SLC. Carse investigated Tegra's claims and then provided a report to the district court. Additional details about Carse's appointment, investigation, and report are summarized in the next section.

### 3. SLC Testifies at Evidentiary Hearing

The district court conducted an evidentiary hearing to decide whether it would adopt the determinations in the SLC report. Carse was the only witness to testify.

### (a) Appointment, Role, and Independence

Carse testified that he was a certified public accountant and had worked in accounting for 44 years. He was certified in fraud examination and in financial forensics. Prior to this matter, he had not investigated self-dealing or fiduciary breaches.

Carse testified that he agreed to serve as an SLC after representatives of the Boesharts contacted him. Carse testified that independence was important to him because it was the basis of his career as a certified public accountant. Carse denied any

financial stake in the LLC and any prior relationship with the parties or counsel.

Carse understood that he was acting on behalf of the LLC. As Carse read § 21-168, after an adequate investigation, the SLC was directed to choose one of the four results listed therein. Carse testified that his job was to determine what was in the best interests of the LLC.

Soon after Carse's appointment, the district court appointed legal counsel to represent Carse in his role as SLC. Although appointed by the district court, the SLC counsel had been selected by Patrick and his counsel. Carse acknowledged that he later learned that the SLC counsel had formerly been a longstanding partner at the firm that had served as the LLC's outside general counsel from the LLC's inception. Carse testified that the SLC counsel did not decide how Carse should do his investigation. The SLC counsel served as a "conduit to flow information to the [Boesharts] and [Tegra]" and made court filings.

In carrying out his SLC duties, Carse relied on his own reading of § 21-168 as an accountant. Carse explained, "It seem[ed] to be written very straightforward. . . . [T]here's not a lot of interpretation [that] needs to be provided." Carse denied that a decision about whether the lawsuit should proceed involved "decisions on the law" other than reading § 21-168. It was Carse's reading of § 21-168 that he did not need to apply law to the facts he investigated. "I did not make any legal analysis," he testified. Carse denied asking counsel whether his reading of § 21-168 was a correct interpretation.

Carse testified that he focused his investigation on the claims in Tegra's lawsuit, but he also testified that he did not know the legal elements of the claims and did not assess whether the legal elements were satisfied. Carse recalled that he was not provided with the SLC counsel's opinions regarding the allegations. Neither did Carse rely on the parties' initial letters to the SLC counsel that outlined their views of key facts and the law, which Carse "perused" and "briefly read."

Carse testified that these initial letters contained "a bunch of legal information" and that he "didn't find either one of them very informative in the way [he] interpreted the statute that [he] was operating under." He testified that the content of the letters was "like Greek" to him, he "didn't understand it," and "so [he] didn't think that [it] was going to impact [his] investigation."

### (b) Investigation Methods

Carse testified that he limited his investigation to a 5-year period because 5 years was a reasonable and round number and he believed that if there were any dramatic errors to be found, they would show up during that timeframe. Carse testified that he reviewed thousands of pages of documents and spent approximately 300 hours on his investigation and report.

Carse did not interview witnesses or hire outside experts. He believed he could obtain adequate information from the parties through written questions and requests for documents. After the first round of answers and documents, Carse asked for further information, as needed. Carse testified that he also relied on Tegra's complaint and on the operating agreement for the LLC that described how the entity was to be governed by the members.

Carse stated that based on his reading of § 21-168, he believed it was "up to Tegra" to bring the evidence to him to support the allegations it was making. He did not require the Boesharts to present evidence to the SLC to disprove Tegra's allegations.

### (c) Related-Party Leases

Tegra's lawsuit alleged that the Boesharts had engaged the LLC in leases with the Boesharts' other business entities at above-market rates, to the detriment of the LLC and with no legitimate business purpose. Tegra further alleged that the Boesharts did not make the proper disclosures about these leases to the LLC's members. Tegra claimed another instance

where Patrick caused the LLC to purchase a crane, then to sell the crane to an entity the Boesharts owned at the same price, only to later cause the LLC to lease the crane, with such payments totaling more than the purchase price.

Tegra requested that Carse review leases going back about 20 years. But Carse testified he reviewed leases obtained over approximately a 5-year period because he thought that timeframe was "reasonable." Carse agreed that Tegra had provided him with evidence that there was overcharging on the leases over a 5-year period. Carse did not know how long the practice of related-party leases had persisted.

Carse testified that he compared the purchase price of the equipment leased to the lease prices over time and determined that the lease prices over time were above, in some instances well above, the estimated cost to purchase the equipment. Regarding the crane, Carse testified that the transactions were "detrimental, for the most part, to [the LLC], and a reasonable person [or] third party would not have leased it . . . at those amounts." But Carse said this did not raise a "red flag" in his mind about other allegations of self-dealing. He testified that while there may have been self-dealing in one instance, it did not necessarily mean there was self-dealing in other instances. Yet, he also testified that when someone is found to have committed one malfeasance, there are usually multiple instances of malfeasance. Carse opined that from an accounting standpoint, the concerns regarding the leases were immaterial in relation to the company's total sales. Carse testified that he did not ask the Boesharts for the written leases or information regarding the specifics of each transaction because he did not see the need to investigate further. Carse denied knowing whether the law permitted the leases.

Carse concluded that Tegra had failed to provide him with enough evidence about the leases to support its allegations and convince him it was in the best interests of the LLC to continue the lawsuit under Tegra's control. In the end, Carse opined that the members of the LLC should have the opportunity to vote

regarding the leases. He testified that the leases in years prior to the 5-year period he investigated needed to be "detailed out and presented to the members of the LLC, and the members can decide what they want to do with the leases." Carse denied that it was "up to the members" to uncover those leases. He testified, "It all comes down to someone, maybe me or someone who . . . has to come up with the amounts of these leases and present them to the members." Carse explained that whether to continue the leases, modify the leases, require approval for future leases, or not vote at all was a "decision for the members to make. They own the company."

(d) Salaries and Bonuses

Tegra alleged that the Boesharts caused the LLC to pay bonuses totaling $1 million to members of the Boeshart family. Tegra acknowledged that the transaction had been fully unwound and repaid to the LLC, but asserted that additional unpaid penalties, professional fees, or interest payments could have resulted.

Carse agreed that the bonuses totaling $1 million represented improper management of LLC funds, and he believed the provision of such bonuses was far beyond what he would expect a member-manager to unilaterally decide. Carse noted that Patrick executed the bonuses based on advice from the LLC's certified public accountant, but Carse opined this was something that should have gone to the members for a vote. Carse could not see any justification for the transaction and agreed that it was "way out of line." Carse emphasized that $1 million had been paid back to the LLC, but he acknowledged that close to half of that amount was not paid back to the LLC until after Tegra filed its lawsuit. Carse testified that any penalties, fees, or lost interest should be paid by the Boesharts. Carse did not, however, attempt to quantify the potential damages that Tegra could recover for the transaction. Instead, he "estimated . . . in [his] own mind" that a member meeting would be less expensive than to "tie up four attorneys and a judge and court."

Carse concluded that the members "may vote to determine if reimbursement should occur."

Tegra further alleged that the Boesharts had received excessive salaries. Carse characterized some of the Boesharts' salaries as comparable to what they earned in their previous employment or to other LLC employees' salaries. Carse admitted he did not independently investigate whether Patrick's $250,000 annual salary was reasonable, because he did not think it was an unreasonable salary for Patrick's position in a company of the LLC's size that Patrick himself had founded. Carse noted that as he read the operating agreement, it did not require member preapproval of salaries, but that salaries would be subject to approval only if members affirmatively inquired; and he opined that the members did not care what Patrick's salary was, because it was not reflected in meeting minutes. However, Carse acknowledged that the Boesharts likely set the meeting agenda and he opined that it was up to the members to investigate the salary the manager unilaterally set for himself. He testified that approval of Patrick's salary was something the members should discuss.

Tegra also opposed $45,000 bonuses paid to Patrick and Sandra one year, which was more than anyone in the LLC received as a bonus that year. Carse confirmed that the bonuses were paid, but he did not investigate why the bonuses were paid or whether the bonuses were "deserved," because he believed such inquiries to be irrelevant, even though he acknowledged that Tegra had alleged that the bonuses were not merited. Asked how he could know the bonuses were reasonable without knowing why they were paid, Carse testified that he relied on his "[f]orty-four years' worth of business experience" to conclude the bonuses were not "out of line" for a business of the LLC's size. Carse determined that the $45,000 bonuses should be discussed at the next member meeting.

### (e) Luxury Vehicles

Tegra's lawsuit asserted that the Boesharts had repeatedly caused the LLC to provide new luxury vehicles for their

personal use, without the LLC members' authorization. Carse "found nothing wrong with the . . . company-provided vehicles." Carse did not investigate why the vehicles were provided to the Boesharts, but he observed that it was common for a company to provide perks like luxury vehicles for employees' business and personal use as a way to impress customers, vendors, and the general public. Carse also agreed that the luxury vehicles were a form of compensation. Carse believed it was within Patrick's authority to decide what vehicles to provide for employees. Carse concluded that there was no merit to Tegra's claims regarding luxury vehicles and recommended that the members discuss whether they wanted to continue the vehicle leases going forward.

(f) Financial Mismanagement

Tegra alleged that the Boesharts were mismanaging the LLC's funds by allowing the LLC to pay for the Boesharts' personal expenses. This allegation centered in part on charges to a credit card in the Boesharts' names. The Boesharts used the card for personal and business expenses. The LLC paid for all charges, and the Boesharts reimbursed the LLC for the charges that they represented were personal expenses.

Carse testified that although he was provided credit card statements from 2015 through part of 2020, he limited his investigation of the charges to 2019 and part of 2020. For that period, he traced all reimbursements, matching all charges identified as personal to reimbursement payments coming from either the Boesharts' personal account or one of the other Boeshart-owned companies. However, he did not investigate expenses that Tegra claimed were personal but labeled as business expenses. Carse explained that this was because Tegra did not supply him with sufficient documentation to convince him that the expenses were misidentified, as he thought was its role. Moreover, Carse did not request the underlying receipts for the disputed charges, and he did not believe the amounts

were "material" from an accounting standpoint when compared to the sales generated by the company.

Carse testified that using the same credit card for business and personal expenses was not an unusual practice and that the "key thing" was to identify personal items and reimburse the company for those personal items. Carse testified that he deemed Sandra "quite capable of accurately identifying which charges are [the LLC's] expenses and which charges are personal." Carse agreed with the statement that it was not "within the scope of [his] investigation to ask the Boesharts what they spent their money on."

### (g) Trips

Tegra's lawsuit also asserted that the Boesharts had caused the LLC to pay for trips to other states and countries, which Tegra termed excessive business travel or personal travel at the LLC's expense.

Carse determined that the Boesharts had shown that the disputed trips were for business purposes. Regarding a trip to Cincinnati, Ohio, by Sandra, for example, Carse testified that he assumed it was a business trip: "[I]t looked to me, as a professional accountant looking at that, that, jeez, I think there might be a reason why she would go there. Why should I question that? [Tegra] supplied me with nothing to prove that that was personal." When asked what legitimate business reason he assumed the trip was for, Carse answered, "I don't know. I don't run their business. They run their business." He did ask the Boesharts to provide an explanation of the business purposes for trips to Hawaii, Puerto Rico, and Guam; and he took their explanations as true.

### (h) Conclusions

Carse testified that all his opinions were made to a reasonable degree of accounting certainty. Carse stated that based on his professional training, he was able to reconcile all the disputed expenditures with the LLC's general ledger. Carse

testified that he declined to further investigate some issues because he deemed the amounts involved not "material." Carse explained that accountants regularly determine whether amounts are material, that whether an amount is material is a "judgment call," and that an amount is material if it would be important to the user of a financial statement. Carse concluded that some amounts were not material by comparing them to the total revenue of the LLC.

Carse testified that his investigation involved no legal analysis. But as an accountant and businessperson reading the allegations and weighing the evidence he was provided, he "felt that [the facts presented] didn't satisfy the claims that were in the lawsuit." Carse stated, "Based on what [Tegra] provided to me, I didn't think it would hold up in court." However, as noted above, he denied knowing the legal elements of Tegra's claims, and he denied asking the SLC counsel for any legal advice or legal interpretation regarding Tegra's allegations, instead relying on his own business experience. He testified, "I had not applied anything from a legal standpoint in any case situation within the entire investigation."

Carse specifically denied understanding or considering any fiduciary duties between the parties or their impact on the burden of proof in the lawsuit. When asked whether certain actions of Patrick's breached his fiduciary duties to the LLC, Carse testified, "Are you speaking of a legal duty? I don't do the law. . . . I don't understand the law. I didn't do the law; so I can't answer 'yes' or 'no' if I don't know the law." Instead of the law of fiduciary duties, Carse referred to the terms of the operating agreement to determine Patrick's obligations.

Carse also testified that his assessment of the LLC's best interests did not include a specific cost-benefit analysis. Carse denied trying to quantify potential damages related to specific actions by the Boesharts that were "out of line"—the $1 million bonus or the leases—or trying to determine whether the potential recovery would be greater than the cost of pursuing

those two claims. Instead, as noted before, Carse relied on what he "estimated . . . in [his] own mind": Resolving matters in a member meeting would be cheaper than litigation involving "four attorneys and a judge." Carse acknowledged that he did not know the cost to litigate the claims, except that he "just [knew] that it's a whole lot more than a member meeting."

Carse believed his recommendation of resolving certain matters at a member meeting constituted making a determination under § 21-168(d)(3) to "settle[] on terms approved by the [SLC]." Carse testified that he planned to oversee the member meeting and that if he was not satisfied the outcome was fair to the LLC, he would report to the district court that the lawsuit should proceed. However, Carse agreed that as SLC, he could not require the members to vote, and he testified that if the members decided the leases were "fine, let bygones be bygones," that would be "okay" with him. He testified, "They're the members. They own it. They get to decide." Carse further explained:

> If the members wanted to have a change made and the Boeshart manager did not want to make the change, then I'm coming back to the Court. If they do exactly what the members want to do, then I'm fine with that. They're grown ups. They can make their own decision. They own the company.

### 4. District Court's Initial Order

Following the evidentiary hearing, the district court entered an order. It found that Carse's investigation was consistent with an investigation by someone of his professional background and that "he reviewed the claims of [Tegra], did a records review, and found enough to recommend that the parties attempt settlement." The district court ultimately found that Carse acted "with enough disinterested independence and good faith to support a determination that the parties attempt to settle these claims." However, the district court observed that it

was beyond the statutory authority of the SLC to send matters to the members for a majority vote. It explained:

> Beyond the fact that these recommendations would seem to put [the Boesharts], accused of self-dealing, in a position to act in their own best interest and to the detriment of the . . . LLC and its other members, there is no language in §21-168(d) that allows the SLC to make recommendations for [the LLC] to complete. The SLC was authorized by statute to choose one of four options, it chose settlement, and the additional recommendations of the SLC will not be considered by this Court.

The district court ordered the parties to commence mediation of the claims in Tegra's complaint. The district court stated that "[u]pon conclusion of [m]ediation, the SLC is [o]rdered to report to the Court the outcome of the mediation and make further recommendations per §21-168."

### 5. Interlocutory Appeal Dismissed

Tegra appealed the district court's initial order. We dismissed the appeal, concluding that Tegra had not appealed from a final judgment or final order. See *Tegra Corp. v. Boeshart*, 311 Neb. 783, 976 N.W.2d 165 (2022).

### 6. Proceedings Resume, Action Dismissed Upon SLC Report

After the proceedings resumed in the district court, Patrick appointed a new single-member SLC because Carse had developed health problems. The parties also engaged in mediation, but it did not result in a settlement.

After the unsuccessful mediation, the district court accepted briefs on how the case should proceed. It then entered an order, stating "[t]he fact that [m]ediation did not result in a resolution . . . does not change the Court's opinion of the SLC's determination here." The district court found that Carse had conducted the investigation and made the recommendation in good faith, independently, and with reasonable care. It expressly adopted

the SLC's determination and ordered that the case "shall be set-tled on terms approved by the [SLC] as outlined in [the SLC's initial report]." It ordered the SLC to inform the district court when the matter had been resolved and to move for dismissal.

The SLC, through its counsel, subsequently filed a motion requesting that the district court enter an order "dismissing this litigation." Attached to the motion was a report by the SLC. The report stated that the LLC held a member meeting at which reso-lutions were approved. The report included a summary of those resolutions. The report, which was signed by Carse's replace-ment, also stated that the SLC "is satisfied as to the resolutions to this matter as presented and recommends this dispute be dis-missed by the Court." The SLC's report does not appear in the bill of exceptions. Neither does our record contain any evidence regarding the member meeting, the resolutions, or why the SLC was "satisfied as to the resolutions to this matter."

Tegra filed a motion requesting leave to conduct discovery of the SLC regarding the report that was attached to its motion to dismiss. The district court denied the motion for leave to conduct discovery and dismissed "[a]ll claims . . . whether asserted in an individual or derivative capacity." In deciding that the matter should be dismissed, the district court described the SLC's report as "merely a report to the Court that the Court's . . . directive [as to how the case should proceed] has been completed."

Tegra filed a timely appeal.

## II. ASSIGNMENTS OF ERROR

Tegra does not challenge the dismissal of its individual claims, but it assigns numerous errors by the district court in ruling on its derivative claims. Its central assignment of error is that the district court erred in finding that "the SLC satisfied its burden of establishing independence, good faith, and rea-sonable care as required by [§] 21-168." As we will discuss in more detail below, that is the only assignment of error we need to address to resolve this appeal.

### III. STANDARD OF REVIEW

This is the first case in which this court has had the opportunity to review a district court's assessment of whether an SLC appointed pursuant to § 21-168 satisfied its burden of proving that it "conducted its investigation and made its recommendation in good faith, independently, and with reasonable care." § 21-168(e). Because we are plowing new ground and because § 21-168 does not directly speak to the issue, our standard of review is not immediately clear. In addition, the parties are at odds on the question. Tegra posits that we should review the district court's determination de novo, while the Boesharts assert that we should review the district court's determination for an abuse of discretion. We agree with Tegra, find the Boesharts' contrary arguments unavailing, and conclude our review is de novo on the record.

When there is no specific statutory direction regarding an appellate standard of review, our standard of review is often dictated by the nature of the underlying action. See, e.g., *Punchochar v. Rudolf*, 315 Neb. 650, 999 N.W.2d 127 (2024) (setting forth standard of review for appeal from equity action); *Brauer v. Hartmann*, 313 Neb. 957, 987 N.W.2d 604 (2023) (setting forth standard of review for appeal from bench trial of law action). As Tegra points out, in its previous appeal from the district court's initial order, we observed that "[t]he underlying order herein appealed was made, broadly, within a derivative action on behalf of an LLC," *Tegra Corp. v. Boeshart*, 311 Neb. 783, 801, 976 N.W.2d 165, 181 (2022), and that "any proceedings under § 21-168 are merely a step in the underlying derivative action." *Tegra Corp. v. Boeshart*, 311 Neb. at 807, 976 N.W.2d at 185. In short, this is an appeal from a district court's dismissal of a derivative action.

We have repeatedly held that a derivative action is an equitable proceeding. See, e.g., *id.*; *Trieweiler v. Sears*, 268 Neb. 952, 689 N.W.2d 807 (2004); *Woodward v. Andersen*, 261 Neb. 980, 627 N.W.2d 742 (2001); *Evans v. Engelhardt*, 246

Neb. 323, 518 N.W.2d 648 (1994). In appeals from equitable proceedings, the standard of review is de novo on the record. See Neb. Rev. Stat. § 25-1925 (Reissue 2016). See, also, *Schmid v. Simmons*, 311 Neb. 48, 970 N.W.2d 735 (2022); *Trieweiler v. Sears, supra.*

The Boesharts do not contest the equitable nature of the underlying derivative proceeding, but nonetheless argue that a de novo review of a district court's determinations under § 21-168 is inappropriate. They argue that a de novo standard of review is inconsistent with § 21-168 and fails to account for the fact that the district court will be forced to assess the weight and credibility of evidence in determining whether an SLC acted with good faith, independence, and reasonable care. As we will explain, we disagree.

In arguing that an abuse of discretion standard is required by § 21-168, the Boesharts rely heavily on *Auerbach v. Bennett*, 47 N.Y.2d 619, 393 N.E.2d 994, 419 N.Y.S.2d 920 (1979), an oft-cited decision of New York's highest court regarding what courts may consider in reviewing an SLC's determination as to the disposition of a derivative lawsuit. *Auerbach* holds that a trial court "may inquire as to the disinterested independence of the [SLC] and as to the appropriateness and sufficiency of the investigative procedures chosen and pursued by the [SLC]," but that it must stop short of reviewing the SLC's ultimate business decision. 47 N.Y.2d at 623-24, 393 N.E.2d at 996, 419 N.Y.S.2d at 922.

*Auerbach* stands in contrast to another approach to SLC determinations adopted by the Delaware Supreme Court in *Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del. 1981) (*Zapata*). The *Zapata* approach essentially adds a second step to the *Auerbach* analysis. *Zapata* holds that after inquiring into the SLC's independence and the sufficiency of its procedures, a court can exercise its independent judgment in determining whether the corporate interest is served by the derivative suit's continuance. See *Boland v. Boland*, 423 Md.

296, 31 A.3d 529 (2011) (summarizing differences between *Auerbach* and *Zapata*). The Boesharts assert that § 21-168 adopts the *Auerbach* standard rather than the *Zapata* standard and that we should therefore review the district court's determination under § 21-168 for abuse of discretion. We agree with the Boesharts that § 21-168 follows *Auerbach*, but disagree that it compels an abuse of discretion standard of appellate review.

There is no question that, consistent with *Auerbach*, a court's review of an SLC's determination under § 21-168 is limited. Section 21-168(e) provides that a district court "shall enforce the determination of the [SLC]" if the district court determines that the SLC "conducted its investigation and made its recommendation in good faith, independently, and with reasonable care." As we said in our initial opinion in this matter, under § 21-168, "[t]he [district] court enforces the [SLC's] *business decision* if the court finds that the [SLC members] were disinterested and independent and that the [SLC] acted in good faith, independently, and with reasonable care." See *Tegra Corp. v. Boeshart*, 311 Neb. 783, 805–06, 976 N.W.2d 165, 184 (2022) (emphasis supplied). That is, although the district court is charged with deciding matters of the SLC's good faith, independence, and reasonable care, § 21-168 does not give the courts a role in questioning whether the SLC's determination as to how the derivative lawsuit should proceed is, in fact, in the best interests of the company.

Lest any doubt remain about the applicability of the *Auerbach* standard, the comments section of the Revised Uniform Limited Liability Company Act (RULLCA) provides that under the language of the statute, "[t]he standard stated for judicial review of the SLC determination follows *Auerbach* . . . rather than *Zapata*." See Rev. Unif. Limited Liability Company Act (2006), § 905, comment, 6C U.L.A. 368, 370 (2016). The language of § 21-168 is identical to the corresponding section in the RULLCA; and when the Legislature

adopted § 21-168, it incorporated the RULLCA's comments. See, Rev. Unif. Limited Liability Company Act, *supra*; 2010 Neb. Laws, L.B. 888. See, also, *Midwest Renewable Energy v. American Engr. Testing*, 296 Neb. 73, 894 N.W.2d 221 (2017) (recognizing that Nebraska Legislature adopted RULLCA and incorporated RULLCA comments).

But while we agree that § 21-168 follows *Auerbach*, we disagree that appellate courts must therefore review a district court's assessment of an SLC's good faith, independence, and reasonable care for an abuse of discretion. In advocating for an abuse-of-discretion standard of review, the Boesharts suggest that de novo appellate review deprives the SLC of the deference afforded by *Auerbach*. However, this position misunderstands *Auerbach* and confuses the deference all courts owe to an SLC with the level of deference the appellate court affords to the trial court.

*Auerbach* speaks to the substance of what courts are to review. Under *Auerbach*, no court, appellate or otherwise, reviews the SLC's ultimate business decision; instead, courts defer to the SLC's business judgment. But it does not follow that an appellate court must apply a deferential abuse-of-discretion standard of review in deciding whether a trial court correctly assessed the aspects of an SLC's determination that are subject to review, i.e., whether the SLC "conducted its investigation and made its recommendation in good faith, independently, and with reasonable care" pursuant to § 21-168(e).

The Boesharts are mistaken that a de novo review would result in appellate courts' weighing in on SLC's business decisions, contrary to *Auerbach*. A de novo on the record review refers to the fact that an appellate court is to generally reach conclusions independently rather than defer to the findings of the trial court. See *Trieweiler v. Sears*, 268 Neb. 952, 689 N.W.2d 807 (2004). Appellate courts can consider the SLC's good faith, independence, and reasonable care independently of the trial court's findings on those issues without weighing in

on the SLC's ultimate substantive determination, which is not properly the subject of any court's review.

In addition to their argument based on *Auerbach*, the Boesharts argue that an abuse of discretion standard of review is compelled by the fact that in determining an SLC's good faith, independence, and reasonable care, district courts may be required to weigh evidence and make credibility determinations. They point out that at least one court mentioned such considerations in deciding to review the dismissal of a derivative action based on an SLC's report for an abuse of discretion. See *Kokocinski ex rel. Medtronic v. Collins*, 850 F.3d 354 (8th Cir. 2017).

We are not persuaded that the need for district courts to weigh evidence and make credibility determinations demands an abuse of discretion standard of review. Our de novo on the record review allows us to defer to the district court's weight and credibility determinations. As we often say, in a de novo on the record review, where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Trieweiler v. Sears, supra*.

[1] Unpersuaded by the Boesharts' arguments to the contrary, we conclude that our standard of review is determined by the equitable nature of the derivative action. Accordingly, we conclude that an appellate court reviews de novo on the record a district court's determination pursuant to § 21-168(e) that an SLC "conducted its investigation and made its recommendation in good faith, independently, and with reasonable care." Under such a review, an appellate court reaches a conclusion independent of the findings of the trial court, provided that where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Trieweiler v. Sears, supra*.

## IV. ANALYSIS

Although many other jurisdictions have developed jurisprudence pertaining to SLCs, until today, we have not addressed the merits of an appeal arising out of proceedings under § 21-168. Tegra's assignments of error raise questions about various aspects of the district court's findings and procedure under that statute. Our analysis, however, need not venture into all facets of the § 21-168 proceedings below to dispose of this appeal. That is because we conclude that the district court erred when it found that the SLC conducted its investigation and made its recommendation with reasonable care pursuant to § 21-168(e). This finding alone dictates that the district court's dismissal of the case be reversed and that the cause be remanded for further proceedings.

[2] Under § 21-168, quoted in relevant part above, the purpose of an SLC is to investigate the claims made in the action and determine whether pursuing the action is in the best interests of the company. *Tegra Corp. v. Boeshart*, 311 Neb. 783, 976 N.W.2d 165 (2022). The SLC, after an "appropriate investigation" pursuant to § 21-268(d), files a statement of determination and report with the district court, making one of four specific determinations as to the continuance, settlement, or dismissal of the derivative proceeding. See § 21-168(d) and (e).

Section 21-168(e) provides the district court's next steps and bears repeating in part here:

The court shall determine whether the members of the [SLC] were disinterested and independent and whether the [SLC] conducted its investigation and made its recommendation in good faith, independently, and with reasonable care, with the [SLC] having the burden of proof. If the court finds that the members of the [SLC] were disinterested and independent and that the [SLC] acted in good faith, independently, and with reasonable care, the court shall enforce the determination of the [SLC].

> Otherwise, the court shall dissolve the stay of discovery entered under subsection (a) of this section and allow the action to proceed under the direction of the plaintiff.

Thus, the district court's decision whether to enforce the SLC's determination depends on whether the SLC "conducted its investigation and made its recommendation in good faith, independently, *and* with reasonable care." § 21-168(e) (emphasis supplied). If any one of those attributes—good faith, independence, or reasonable care—is absent, the district court cannot enforce the SLC's determination and must allow the action to proceed. See *In re Interest of LeVanta S.*, 295 Neb. 151, 887 N.W.2d 502 (2016) (when connecting list of elements, "and" connotes conjunctive list, requiring each item on list to be met). See, also, Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 116 (2012) (discussing "conjunctive" and "disjunctive" lists). For purposes of this opinion, our focus is on whether the SLC conducted its investigation and made its recommendation with reasonable care. We conclude that it did not.

What is "reasonable care" in the context of § 21-168(e)? Section 21-168 does not supply a definition. Courts in other jurisdictions have assessed the reasonableness of an SLC's investigation, but they have not articulated an all-purpose definition of reasonable care for every scenario an SLC may encounter. See Ronald J. Colombo, Law of Corporate Officers and Directors—Rights, Duties and Liabilities § 9:31 at 574 (2023) ("[a]lthough the need for a reasonable investigation is clear, there are no fixed standards for determining the sufficiency of [SLC] investigations"). This makes sense because, as this case illustrates, the circumstances an SLC may be called to investigate and analyze can vary widely.

Although there are no fixed standards of reasonable care, in assessing the adequacy of the investigation underlying an SLC's recommendation for the best interests of the business entity, courts in other jurisdictions have emphasized that the

investigation must exhibit a thoroughness commensurate with the legal claims at issue. See *id.* See, also, *Day v. Stascavage*, 251 P.3d 1225 (Colo. App. 2010) (thoroughness is cornerstone of court's review of SLC procedures, and investigation was legally inadequate because it was not sufficiently thorough); *Houle v. Low*, 407 Mass. 810, 822, 556 N.E.2d 51, 58 (1990) (SLC "must conduct a thorough and careful analysis regarding the plaintiff's derivative suit"). As *Auerbach* observed, an SLC must consider "how appropriately to set about to gather the pertinent data" and employ "methodologies and procedures best suited to the conduct of an investigation of facts and the determination of legal liability." *Auerbach v. Bennett*, 47 N.Y.2d 619, 634, 393 N.E.2d 994, 1002, 419 N.Y.S.2d 920, 929 (1979). *Auerbach* recognized that the decision whether to pursue a derivative action involves "the weighing and balancing of legal, ethical, commercial, promotional, public relations, fiscal and other factors familiar to the resolution of many if not most corporate problems." 47 N.Y.2d at 633, 393 N.E.2d at 1002, 419 N.Y.S.2d at 928. Factors identified as relevant to the thoroughness of the investigation include the length and scope of the investigation, the use of experts, the corporation or defendant's involvement, and the adequacy and reliability of information supplied to the SLC. See *Blohm v. Kelly*, 765 N.W.2d 147 (Minn. App. 2009). See, also, *Sarnacki ex rel. Smith & Wesson Holding v. Golden*, 4 F. Supp. 3d 317, 325 (D. Mass. 2014), *affirmed sub nom. Sarnacki v. Golden*, 778 F.3d 217 (1st Cir. 2015); *Grafman v. Century Broadcasting Corp.*, 762 F. Supp. 215 (N.D. Ill. 1991); Columbo, *supra*, § 9:31.

Considering the principles above, upon our de novo review, we conclude that the SLC did not satisfy its burden under § 21-168(e) of demonstrating it exercised reasonable care in conducting its investigation and making its recommendation.

Tegra points out a number of discrete aspects of Carse's investigation that suggest a lack of thoroughness. For instance, in addressing Tegra's claim that the Boesharts

had engaged the LLC in lease transactions to their personal benefit and to the detriment of Tegra, Carse limited his investigation of the matter to his arbitrarily imposed 5-year timeframe; and even though he discovered leases that he considered "out of line" during that period, he did not probe any further. As for Tegra's allegation that the Boesharts had categorized personal credit card charges as business expenses, for which the Boesharts did not reimburse the LLC, Carse did not investigate the substance of the allegation but took the Boesharts at their word, stating that Sandra was capable of distinguishing personal expenses from business expenses. To give another example, Carse did not scrutinize why the Boesharts caused the LLC to provide them with vehicles. And while Carse confirmed that certain bonuses had been paid to the Boesharts, he did not investigate Tegra's claim that the bonuses were not merited.

It appears, however, that discrete faults in Carse's investigation were symptomatic of more fundamental problems. For starters, Carse did not base his investigation on the relevant law; and without that rubric, a pervasive lack of thoroughness was sure to follow. As one court has observed, "The SLC cannot arrive at a reasonable answer if [it] addresses the wrong issues. Thus, addressing the wrong issues is an example of unreasonable methodology." See *Boland v. Boland*, 423 Md. 296, 358, 31 A.3d 529, 566 (2011).

Carse was charged with determining whether continuing Tegra's derivative suit was in the LLC's best interests. And while Carse testified that he thought Tegra's claims would not "hold up in court," he reached that conclusion without considering the law that governed the claims. In deciding whether it was in the LLC's best interests to continue the lawsuit, he disclaimed making any determination whether the legal elements of Tegra's claims were satisfied and did not consult with the SLC's appointed counsel as to the same, believing neither "decisions on the law" nor the application of the law to facts were required for him to carry out his duties as the SLC.

We disagree. Although Carse was not required to become a legal expert, we do not see how he could determine whether continuing the derivative suit was in the LLC's best interests without some understanding of what a court would consider in resolving that suit.

[3] Carse's failure to consider the governing law also led him to assume it was "up to Tegra" to present him with evidence that supported its allegations. But this view failed to account for the nature of Tegra's claims. Again, Tegra's overarching claim was that Patrick breached fiduciary duties to the LLC. As the manager of a manager-managed limited liability company, Patrick owed the LLC fiduciary duties. See Neb. Rev. Stat. § 21-138 (Reissue 2022). When it is alleged that a person holding fiduciary duties has breached those duties, the burden of proof is upon the party holding a confidential or fiduciary relationship to establish the fairness, adequacy, or equity of the transaction with the party with whom he or she holds such relation. *Evans v. Engelhardt*, 246 Neb. 323, 518 N.W.2d 648 (1994). Carse could thus not safely assume that the derivative suit would succeed only if Tegra could identify evidence.

Carse's ignorance of the governing law also left him unable to conduct a cost-benefit analysis, an analysis that thoroughness required. Determining whether pursuing the action is in the best interests of the company "involves weighing, among other things, the merits of the litigation against the direct expenses of litigation and the indirect costs of litigation such as potential waste of management time and adverse public relations." *Tegra Corp. v. Boeshart*, 311 Neb. 783, 805, 976 N.W.2d 165, 183-84 (2022). See, also, *House v. Estate of Edmondson*, 245 S.W.3d 372, 384 (Tenn. 2008) (assessment of whether continuation of derivative suit is in best interests of corporation requires consideration of "likelihood that the plaintiff will succeed on the merits, the financial burden on the corporation of litigating the case, the extent to which dismissal will permit the defendant to retain improper benefits,

and the effect continuing the litigation will have on the corporation's reputation"). Carse admitted that he did not conduct such a cost-benefit analysis, and indeed, he could not have because he did not gather the information necessary to assess the likelihood and amount of the LLC's recovery if the lawsuit proceeded.

With no ability to even roughly calculate what the LLC might recover, Carse could only use his intuition to generally "estimate[] . . . in [his] own mind" that a member meeting would cost relatively less than "t[ying] up four attorneys and a judge and a court." Carse was no doubt correct that a member meeting would result in less cost to the LLC than continuing the litigation. But he could not make a complete assessment of the LLC's best interests by comparing those two expenses. To reasonably determine whether it would be in the best interests of the company to continue the derivative action, Carse had to also consider the potential recovery for the LLC.

Carse did decide not to investigate some disputed expenditures because the amounts were not, in his judgment, material. This was no substitute for the cost-benefit analysis described above. We do not question that an SLC could reasonably conclude, after weighing the likely recovery against costs of litigation or other intangible costs, that it is not in the best interests of the corporation to pursue a particular derivative claim. That is not, however, what Carse did. According to his testimony, he declined to investigate some expenditures because he deemed the amounts a small percentage of the LLC's revenues. We agree with Tegra that it could be in a company's best interests to pursue a derivative claim regarding an amount that is small in comparison to the company's total revenues, especially if potential recovery exceeds the estimated cost of attaining it.

In lieu of analyzing the legal merits of the LLC's claims and conducting a cost-benefit analysis, Carse's solution was to convene a meeting at which the members would have the

opportunity to consider certain actions of the Boesharts that were the subject of Tegra's complaint. This did not fulfill the SLC's duties under § 21-168. As we have noted, Carse concluded that certain acts by the Boesharts were "out of line," but he opined that allowing the members the opportunity to express approval or disapproval of those actions would resolve the dispute without the expense of a lawsuit. Tasked with deciding whether the LLC's best interests would be served by continuing the litigation, ending it entirely, or settling it on terms of his choosing, Carse did not complete his job. Instead, he delegated it to others.

Not only did Carse delegate away his primary function, he delegated it to the members of the LLC, reasoning that "[t]hey own the company." Although the members of the LLC undoubtedly owned the company, they were not appointed as the SLC, did not investigate Tegra's claims, and may not have acted to resolve the issues based on the best interests of the LLC, as Carse was obligated to do. This delegation was not consistent with reasonable care. As one court has observed, "One clear example of an SLC's unreasonable methodology is when the SLC itself defers to the decision of the directors, instead of making its own independent review of the transactions in question." *Boland v. Boland*, 423 Md. 296, 349, 31 A.3d 529, 561 (2011), citing *Hirsch v. Jones Intercable, Inc.*, 984 P.2d 629, 638 (Colo. 1999) ("'[t]he purpose to be served by any [SLC] is to *substitute its independent . . . judgment* for the judgment of the directors who have been accused of wrongdoing'") (emphasis supplied) (emphasis in original).

The Boesharts may deny that Carse delegated his SLC duties by pointing to Carse's testimony that he planned to oversee the member meeting and that if he felt the members' resolution was unfair, he would recommend that the case should proceed. In light of the record, that testimony does not move us. First, we discern conflict between Carse's statements that he might object to a members' resolution if he deemed it unfair and other parts of his testimony where he seemed to

say that the only potential resolution he would not rubber-stamp involved the Boesharts' refusal to take measures agreed upon by the members. Moreover, Carse was replaced as the SLC prior to the member meeting, and there is no evidence in the bill of exceptions that suggests that his successor could or did independently assess whether the members' resolution was in the LLC's best interests as Carse had envisioned doing. The SLC attached a report to its motion to dismiss in which Carse's replacement, with no additional explanation, stated he was "satisfied" with the members' resolution, but that document appears only in the appellate transcript. It was not offered and received as evidence and made a part of the bill of exceptions. See *Yochum v. Yochum*, 312 Neb. 535, 546, 980 N.W.2d 17, 26 (2022) ("[a] bill of exceptions is the only vehicle for bringing evidence before an appellate court; evidence which is not made a part of the bill of exceptions may not be considered").

The Boesharts argue that the SLC exercised reasonable care, because Carse reviewed voluminous documents, spent significant time, and adhered to accounting standards. The record does show that Carse spent many hours reviewing the documents submitted for the timeframe he set for his investigation and analyzed them from an accounting standpoint to confirm that the disputed expenditures paralleled the LLC's general ledger. But under the circumstances of this case, these factors do not prove that Carse acted with reasonable care. As an initial matter, Tegra's suit did not contend that the expenditures at issue were inaccurately recorded; it primarily alleged that the Boesharts could not legally cause the LLC to incur those expenditures at all. Further, in assessing the reasonableness of an SLC's investigation, "the mere length of the report and the sheer volume of items considered should not be given undue weight by the court. Page totals are a shallow metric." *Boland v. Boland*, 423 Md. 296, 357, 31 A.3d 529, 566 (2011). Carse's time and effort in applying accounting principles may

suggest he "pursued [the] chosen investigative methods in good faith." *Auerbach v. Bennett*, 47 N.Y.2d 619, 634, 393 N.E.2d 994, 1003, 419 N.Y.S.2d 920, 929 (1979) ("investigation . . . so restricted in scope, so shallow in execution, or otherwise so pro forma or halfhearted as to constitute a pretext or sham" raises questions of good faith) (emphasis omitted). But our resolution of this appeal does not turn on the SLC's good faith.

The Boesharts also submit that Tegra was obligated to introduce expert testimony that the SLC failed to exercise reasonable care. They cite to professional negligence cases in which such testimony is generally required to show that a professional breached the relevant standard of care and thereby caused damages. See, e.g., *Bixenmann v. Dickinson Land Surveyors*, 294 Neb. 407, 882 N.W.2d 910 (2016), *modified on denial of rehearing* 295 Neb. 40, 886 N.W.2d 277. But, again, we are unconvinced.

First, we are not reviewing a lawsuit against Carse alleging he breached the standard of care for an accountant. In such professional negligence cases, expert testimony is generally necessary for the fact finder to determine what the standard of care requires. See *Bixenmann v. Dickinson Land Surveyors, supra*. This is so because the fact finder, often a jury, cannot usually be expected to know what a reasonable professional in a specialized field would do. But see *id.* (discussing common knowledge exception to expert testimony requirement). By contrast, judicial review of the reasonableness of an SLC's investigation requires no such expert input. "As to the methodologies and procedures best suited to the conduct of an investigation of facts and the determination of legal liability, the courts are well equipped by long and continuing experience and practice to make determinations." *Auerbach v. Bennett*, 47 N.Y.2d at 634, 393 N.E.2d at 1002, 419 N.Y.S.2d at 929. Courts do not require an expert for the type of inquiry they commonly perform.

Second, in suggesting that Tegra was obligated to offer expert testimony that the SLC failed to act with reasonable care, the Boesharts overlook the burden of proof imposed by § 21-168(e). Section 21-168(e) gives the SLC the burden of proving those attributes. See, also, *Boland v. Boland*, 423 Md. at 357, 360, 31 A.3d at 566, 567 (under *Auerbach*, "the SLC is not entitled to a presumption that its investigation and conclusions were reasonable," and "[w]hile courts must defer to the SLC's *substantive conclusions*, they cannot afford any presumption of reasonableness to its methodology") (emphasis in original).

The Delaware Court of Chancery once observed that "[t]he only instance in American Jurisprudence where a defendant can free itself from a suit by merely appointing a committee to review the allegations of the complaint is in the context of a . . . derivative suit." *Lewis v. Fuqua*, 502 A.2d 962, 967 (Del. Ch. 1985). That court concluded that this "unique power" required that a court have some assurance that an SLC was independent before enforcing its determination. *Id.* By enacting § 21-168, our Legislature authorized the use of an SLC in a limited liability company derivative action, but it also cabined that "unique power" by providing in § 21-168(e) that an SLC's determination is to be enforced only if it shows that the SLC "conducted its investigation and made its recommendation in good faith, independently, and with reasonable care." Because we conclude that the SLC failed to show that it acted with reasonable care in this case, we reverse the district court's dismissal of the derivative claims and remand the cause for further proceedings in conformity with this opinion.

Section 21-168(e) provides that if the SLC fails to carry its burden, "the court shall dissolve the stay of discovery entered under subsection (a) of this section and allow the action to proceed under the direction of the plaintiff." Because we find that the district court erred by concluding that the SLC

carried its burden, on remand, the district court shall dissolve any stay of discovery and allow the action to proceed under the direction of Tegra. As the derivative action progresses, we emphasize that our decision in this appeal pertains only to the district court's dismissal pursuant to § 21-168 and should not be understood as expressing a view on the merits of Tegra's allegations.

## V. CONCLUSION

We conclude that the district court erred in finding that the SLC in this case satisfied its burden of proving that it conducted its investigation and made its recommendation with reasonable care pursuant to § 21-168(e). Consequently, we reverse the district court's dismissal of the derivative claims and remand the cause for further proceedings in conformity with this opinion. Because this appeal concerns the derivative claims only, we affirm the district court's dismissal of Tegra's individual claims.

AFFIRMED IN PART, AND IN PART REVERSED AND
REMANDED FOR FURTHER PROCEEDINGS.

HEAVICAN, C.J., not participating.